**MOUNTAIN STATES LEGAL FOUNDATION et al., Petitioners,**

v.

**Douglas M. COSTLE et al., Respondents.**

**State of Colorado ex rel. J. D. MacFarlane, Petitioner–Intervenor.**

No. 79–2261.

United States Court of Appeals, Tenth Circuit.

Argued March 13, 1980.

Decided Aug. 29, 1980.

Rehearing Denied Oct. 6, 1980.

---

James G. Watt and Gale A. Norton, Mountain States Legal Foundation, Denver, Colo. (James W. Sanderson of Saunders, Snyder, Ross & Dickson, Denver, Colo., with them on the brief), for petitioners.

Donald W. Stever, Jr., Atty. Gen., Dept. of Justice, Washington, D. C. (James W. Moorman, Asst. Atty. Gen., and Angus Macbeth, Deputy Asst. Atty. Gen., Washington, D. C., Barbara H. Brandon, Kenneth A. Reich and Jose Allen, Attys., Dept. of Justice, Washington, D. C., with him on the brief), (Michele Biegel Corash, Gen. Counsel, and Bruce Diamond, James N. Cahan and Eric Smith, Attys., Environmental Protection Agency, Washington, D. C., Christine Lipaj Shaver, Atty., Environmental Protection Agency, Denver, Colo., of counsel), for respondents.

Janice L. Burnett, Asst. Atty. Gen., Natural Resources Section, the State of Colorado, Denver, Colo. (J. D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., and Lawrence A. DeClaire, Asst. Atty. Gen., Natural Resources Section, the State of Colorado, Denver, Colo., with her on the brief), for petitioner–intervenor.

Jackson B. Battle, Robert J. Golten and Robert F. Wiggington, Boulder, Colo., filed an amicus curiae brief for National Wildlife Federation.

Before BARRETT, DOYLE and McKAY, Circuit Judges.

BARRETT, Circuit Judge.

Mountain States Legal Foundation, hereinafter referred to as Mountain States,[1] twenty–seven (27) named members of the Senate and House of Representatives of the State of Colorado in their respective official capacities as individually elected legislators of the State of Colorado, and the State of

---

1. A non-profit corporation, organized "as a public interest law center dedicated to bringing before the courts those issues vital to individual rights and freedoms protected by the United States Constitution and the nation's legal traditions", whose offices are in Denver, Colorado, on behalf of its officers, members, and supporters who reside within the "nonattainment" areas affected by the challenged action and in the remainder of the State of Colorado, and who are being deprived of their constitutional and statutory rights.

Colorado *ex rel.* Mountain States, hereinafter jointly referred to as Mountain States, et al., or petitioners, filed a petition for review challenging the constitutional and statutory authorization of a final rulemaking decision of the federal Environmental Protection Agency (EPA) conditionally approving portions of the Colorado air quality control implementation plan. The petition, dated December 4, 1979, was filed pursuant to the Clean Air Act, 42 U.S.C. §§ 7401 *et seq.* and rule 15 of Fed.R.App.Proc., 28 U.S.C.A. The State of Colorado, *ex rel.* J. D. MacFarlane, Attorney General, intervened.

## Background

■ Section 307(b)(1) of the Clean Air Act, 42 U.S.C. § 7607(b)(1), involves a complex web of exclusive jurisdiction governing review of various actions of the Administrator of EPA. Decisions handed down prior and subsequent to the 1977 amendments to the Act make it clear that exclusive jurisdiction for review of regulations or actions of the Administrator of EPA vests in the courts of appeals. *Anaconda Company v. Ruckelshaus*, 482 F.2d 1301 (10th Cir. 1973); *U. S. Steel Corp. v. U. S. Environmental Protection Agency*, 595 F.2d 207 (5th Cir. 1979); *Lubrizol Corp. v. Train*, 547 F.2d 310 (6th Cir. 1976).

The Clean Air Act creates a complicated statutory framework. The responsibility for plans to clean up the air is divided between the federal and state governments. The Act requires the EPA Administrator to establish ambient air quality standards for various pollutants. 42 U.S.C. § 7409. Each state governor is then required to submit a state implementation plan (SIP) designed to accomplish these standards. 42 U.S.C. § 7410. The EPA Administrator thereafter either approves or disapproves the SIP. 42 U.S.C. § 7410(a)(2)(A) through (K). Thus, the Congress clearly intended the final decision to be that of the EPA. *See* 42 U.S.C. §§ 1857(a)(2)(b), 1857c–5, 1857c–6; 42 U.S.C. §§ 7410(a)(2)(I), 7413(a)(5), 7502(a)(1). *See also:* 42 U.S.C. §§ 7411(d)(1), (2)(A) and (B), 7412(d)(1) and (2).

If a state fails to promulgate an acceptable plan, the Act requires that the EPA Administrator formulate and promulgate a federal plan for the governing area. 42 U.S.C. § 7410(c). The 1972 Colorado SIP submitted by the Governor met the approval of the EPA Administrator. 40 C.F.R. § 52.320, *et seq.* However, the 1972 Colorado SIP was required to be revised by virtue of 1977 amendments to the Act dealing with "nonattainment areas", i. e., air quality control regions that fail to meet air quality standards. 42 U.S.C. §§ 7501–7508. States with "nonattainment areas", such as Colorado, were required to submit revised SIPs by January 1, 1979; further, if a state appeared to be unable to meet air quality control standards by December 31, 1982, an additional requirement is imposed by the Act: The implementation of an automobile emission inspection and maintenance (I/M) program. 42 U.S.C. § 7502(b)(11)(B). In the event of a state's failure to comply, the EPA contends it is empowered to ban new construction in nonattainment areas pursuant to 42 U.S.C. § 7410(a)(2)(I), and to withhold federal grants pursuant to 42 U.S.C. §§ 7506(a) and 7616(b).

The EPA's Final Rulemaking on Approval of the Colorado SIP, 44 Fed.Reg. 57401 (October 5, 1979), effectively amended 40 C.F.R. part 52, so as to approve *in part* the revised Colorado SIP mandated by the nonattainment provisions of the Clean Air Act. The revised SIP was submitted to EPA by the State on January 2, 1979. EPA published a notice of proposed rulemaking on May 11, 1979. *See* 44 Fed.Reg. 27691. The final rulemaking notice included four different types of dispositions as to various portions of the SIP: Approval, conditional approval, disapproval, and no final action. The instant case particularly relates to the attainment of the ambient air quality standards for ozone and carbon monoxide in "nonattainment areas" where EPA required I/M programs. These areas included portions of Larimer, Weld, Adams, Arapahoe and El Paso Counties, and the Counties of Denver, Boulder, Douglas and Jefferson.

The EPA contended that Colorado Senate Bill 1, establishing an I/M program to begin on January 1, 1981, and commissioning a study of the effectiveness of various I/M–type programs, was not "adequate enabling authority". Accordingly, the legislation did not receive complete EPA approval. The Administrator found that the legislation was deficient in several respects: (1) the legislature retained the right to approve I/M standards before they were to go into effect; (2) the bill contained no provision for retest after maintenance; (3) its appropriateness for 1981 and later model vehicles was questioned; (4) it lacked schedules for implementation of various administrative elements of the program; (5) the bill needed provisions for recordkeeping; (6) there were no demonstrated commitments to reduce emissions by at least 25% or to implement and enforce the program; and (7) the bill did not provide for unannounced inspection of facilities. 44 Fed.Reg. 57404–05. As a result of these alleged deficiencies, EPA ruled: "It is clear, however, that the program passed by the legislature does not meet the requirements of the Clean Air Act and additional action by the legislature is essential." 44 Fed.Reg. 57405. The EPA Final Rulemaking of October 5, 1979, set forth a timetable for the Colorado state legislature and Governor to follow as a basis for achieving full approval:

January 1, 1980–Senate Bill 1 study to be completed and submitted to legislature.

January 12, 1980–I/M program to be included on list of Governor's Call Items for the 1980 legislative session.

February 1, 1980–Study results in the form of a draft final report to be submitted to legislature.

February 1, 1980–Bill introduced in the legislature–copy submitted to EPA.

March 1, 1980–Submission to EPA of legislation signed into law by the Governor, as well as schedules (milestones, dates, responsible agency) to implement the I/M program and corrections to other noted deficiencies.

44 Fed.Reg. 57405 (1979).

We here observe that the March 1, 1980, "deadline" above referred to was in fact the creation of the Colorado General Assembly, by virtue of its passage of Senate Bill 1 in June of 1979 which provided, inter alia: "The general assembly shall . . . take legislative action thereon, if any, not later than March 1, 1980 . . ." C.R.S.1973, 42–4–306.5(5). The deadline was self–imposed by the Colorado legislature.

The Administrator's mandate was followed by a listing of the consequences of noncompliance, including imposition of the sanctions contained in §§ 176(a) and 316(b) of the Act, 42 U.S.C. §§ 7506(a) and 7616(b), and a prohibition on construction of certain new major facilities in nonattainment areas, 42 U.S.C. § 7410(a)(2)(I). 44 Fed.Reg. 38471 (July 2, 1979). The Administrator emphasized the effect of noncompliance: "Due to potentially severe impacts resulting from the imposition of sanctions, it is vital that the effects be well understood." 44 Fed.Reg. § 57408. Among the Administrator's "examples" of affected projects were planning and research grants, sewage treatment grants totaling $132 million (itemized by project), and an unspecified amount of federal highway funds. The EPA further warned that if it appeared that the state would not meet EPA's schedule, the imposition of sanctions would be accelerated. 44 Fed.Reg. § 57408. These "admonishments" were made by EPA Regional Administrator Roger L. Williams following his meeting on February 28, 1980, with leadership of the Colorado General Assembly during which time the leadership expressed no hope that its own March 1, 1980, deadline would be met and that there was little prospect for the passage of an acceptable I/M program before the end of the legislative session.

On March 1, 1980, EPA notified this Court of its intention to disapprove the carbon monoxide and ozone portions of the Colorado SIP and that it would impose the Section 110(a)(2)(I) moratorium on construction of new major or modified stationary sources of these pollutants in the affected nonattainment areas pursuant to authority it claimed under 42 U.S.C. § 7410(a)(2)(I). At that time, EPA would

also begin to exercise its authority under Sections 176(a) and 316(b) of the Clean Air Act, 42 U.S.C. §§ 7506(a) and 7616(b), to limit federal funds.

The Mountain States petition for review challenges (a) the EPA withholding of federal funds under the Clean Air Act and imposition of a stationary source ban as coercive action designed to achieve specific state legislative action, (b) the EPA Administrator's action under the Clean Air Act of "conditionally approving" or disapproving the SIP, (c) the actions of the EPA Administrator under the Clean Air Act in requiring the Colorado General Assembly to pass legislation meeting EPA criteria and an EPA timetable, and (d) the various actions of the EPA Administrator in violation of the Administrative Procedure Act, the Tenth Amendment, the First Amendment, the Fifth Amendment and Article IV, Section 4 (guarantee of a republican form of government) of the United States Constitution.

The State of Colorado, by and through its Attorney General, as Intervenor, filed a brief in direct, absolute conflict with the contentions raised by Mountain States. The State contended: (a) the EPA Administrator had not exceeded his statutory authority in conditionally approving the Colorado SIP, (b) the actions proposed by EPA pursuant to the Clean Air Act, §§ 176(a), 316 and 110(a)(2)(I), do not violate the Tenth Amendment, (c) EPA's conditional approval does not infringe on First Amendment rights to freedom of speech and to petition the government for redress of grievances, (d) due process of law has not been violated, (e) EPA's conditional approval of the Colorado SIP does not abridge the guarantee of a republican form of government, and (f) Mountain States lacks standing to represent the State of Colorado in an *ex relatione* capacity.

### Proceedings for Stay Pending Review

Following the filing of the aforesaid Petition for Review, Mountain States, et al., filed a Motion for Stay pending this Court's review. The matter was briefed and argued before this Court, following proper notice.

On March 13, 1980, this Court entered its Order granting injunctive relief staying enforcement by the EPA of any and all sanctions to and including May 1, 1980. We further ordered the Petition for Review submitted. In relation to the May 1, 1980, deadline, the Court observes that in the course of oral arguments presented on March 13, 1980, the State of Colorado, by and through the Colorado Attorney General, represented that it was likely that the Colorado General Assembly would enact legislation adopting an I/M program acceptable to EPA on or about May 1, 1980. The Attorney General expressly disclaimed any agreement with the constitutional and statutory challenges raised by Mountain States, et al., in their Petition for Review. In fact, the Attorney General acknowledged that he *did not* share the views expressed by Mountain States, et al., in challenging the constitutionality of the Clean Air Act and/or the actions taken by EPA *preceding EPA's imposition of sanctions.* The Attorney General's sole argument before this Court was that the action of the EPA in imposing the funding withholding sanctions prior to final adjournment of the 1980 session of the Colorado General Assembly would be arbitrary and capricious action because the General Assembly was making reasonable efforts to cure the deficiencies.

On May 2, 1980, this Court's injunctive order expired. On that date the Administrator of EPA imposed the funding and construction sanctions. On May 7, 1980, the Colorado legislature adopted I/M legislation, signed into law by Governor Lamm on May 23, 1980. EPA informed this Court on May 15, 1980, that it tentatively believed the legislation to be adequate under the Clean Air Act and had submitted for publication in the Federal Register a notice proposing approval of I/M legislation as part of the SIP. It was in this setting that this Court, on May 29, 1980, upon its own motion, ordered the parties to file memoranda by June 9, 1980, "showing cause, if any there be, why the appeal should not be dismissed for mootness".

In response to this Court's "mootness" order, the parties have responded as follows:

(1) The Colorado Attorney General took no position on the matter. His position is unexplained.

(2) EPA urged that the Court dismiss the action as moot. EPA points out that while, strictly speaking, the case will be moot only after EPA has taken the final action to approve the I/M legislation as part of the State Implementation Plan following the notice of rulemaking and the comments which may be submitted, the Agency will act promptly, and anticipates lifting all sanctions so that no action will be taken under §§ 176(a) and 316. EPA contends that under Article III of the United States Constitution the jurisdiction of federal courts is limited to those suits presenting a "live controversy" at the time the court reviews the case, citing to *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975) and *DeFunis v. Odegaard*, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974), and that this requirement precludes Article III courts from issuing advisory opinions which cannot affect the rights of the parties in the case before them, citing to *North Carolina v. Rice*, 404 U.S. 244, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971) and *Oil Workers Unions v. Missouri*, 361 U.S. 363, 80 S.Ct. 391, 4 L.Ed.2d 372 (1960). EPA also relies on the recent decision of *County of Los Angeles v. Davis*, 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979) for the proposition that a case is moot when the issues are no longer live or the parties lack a legally cognizable interest in the outcome and where there is no reasonable expectation that the alleged violation will recur.

As to the contention that the legislators and citizens of Colorado must be protected from "coercion", EPA contends that since the Colorado legislature had acted, it no longer requires any "protection" from the alleged "coercion", and *thus if this Court should reach the merits, it would be merely advising the parties as to their constitutional right, should this issue ever arise in the future.* [Memo of EPA, June 10, 1980, pp. 5–6].

With reference to any contention that the matters presented are "capable of repetition yet evading review", thus coming within the exception to the mootness doctrine applied in *Weinstein v. Bradford*, 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975) and *Sosna v. Iowa, supra*, EPA argues that it cannot be demonstrated that the administrative order or action that expired will be repeated and that the new order will again evade review. EPA states that the alleged "coercion" could only occur again if the Colorado legislature either repeals its I/M legislation or fails to implement its provisions; further, that if such "speculative" events should come to pass, petitioners could again file suit after EPA imposes a construction moratorium or funding restrictions.

(3) Mountain States strongly argued that the issues are not moot, will not become moot, and demands judicial resolution. Mountain States contends:

> Senate Bill 52, enacting the EPA–dictated version of an inspection and maintenance program, was narrowly passed by the Colorado General Assembly. A shift of only two votes in the Senate would have defeated the measure. Attached to this memorandum are affidavits [12 of State Senators and Representatives] and a transcript of debates . . . conclusively [demonstrating] that if the EPA sanctions had not been invoked, the legislation in its existing form, S.B. 52, would have been *overwhelmingly defeated* in both the Senate and House . . . Furthermore, if sanctions are lifted and the threat of reimposition is removed, the program will almost surely be modified. The direct and *continuing* effect of EPA's pressure tactics violates the rights of Colorado citizens. . . . If the status of this case has been changed so that the Court considers the case moot, it is because the Court itself has allowed this to happen. . . . The petitioners expected a decision [from this Court] by that time [May 1, 1980]. . . . The legislature passed legislation only after

the Court had refused to prevent EPA from blackmailing the legislature and only after sanctions had actually been imposed. When this lawsuit was initiated, petitioners contended that the threatened sanctions had a chilling impact upon the legislature. Since that time, the sanctions have become a reality, and their ability to control legislative action has been proven. . . . To date this Court has chosen to step aside and allow EPA to intrude into the functions constitutionally given to the Colorado government. . . . Ruling that this case is moot will have severely negative public policy implications. Legislators must not be required to sacrifice the state budget and allow irreparable damage to the state economy in order to have their rights judicially clarified. Declaring the issue of this case [the preservation of the constitutional form of government in America] to be moot would be an unfair and irresponsible act that should not be tolerated by this Court or the Supreme Court of the United States.

[Memorandum of Mountain States, filed June 9, 1980, pp. 1–6].

### The Threshold Issue of Standing

EPA has consistently contended that petitioners, Mountain States, et al. ". . . lack standing to assert any constitutional arguments on behalf of the State of Colorado . . . for review since only the state has standing to make those arguments. The state, moreover, has expressly opposed petitioners' arguments; therefore, there is no case or controversy with respect to these arguments." [Brief of EPA, p. 28]. EPA, citing to those "standing" requirements articulated in Duke Power Co. v. Carolina Env. Study Group, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) and O'Shea v. Littleton, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), argues, inter alia :

One of the "prudential concerns" recognized by the Supreme Court is that one party should not be permitted to rest his claim to relief on the rights of another who does not press those rights. Duke Power Company, supra, [438 U.S.] at 80 [98 S.Ct. at 2634]. The rationale for this limitation was expressed by the Court as follows:

There are good and sufficient reasons for this prudential limitation on standing when rights of third parties are implicated—the avoidance of the adjudication of rights which those not before the Court may not wish to assert, and the assurance that the most effective advocate of the rights at issue is present to champion them.

Neither petitioner, Mountain States Legal Foundation, nor the individual petitioner–legislators, has alleged a sufficient "personal stake" in this controversy to entitle it to raise constitutional arguments on behalf of the State of Colorado.* Only the State has standing to press

\* Indeed petitioners have not even responded, in their brief, to respondents' arguments in its Memorandum in Opposition to Petition for Stay that they lack standing in this case to make any constitutional arguments on behalf of the state.

claims aimed at protecting its sovereign powers under the Tenth Amendment. Here, the State of Colorado has intervened in this case and has directly opposed each of petitioners' constitutional and statutory arguments.

Hence, the one party with clear standing to raise the constitutional arguments made by petitioners not only declined to make those arguments but expressly rejected them. Therefore, this case presents no justiciable case or controversy with regard to the constitutional arguments raised here and the court need not address them. Duke Power Company, supra. [Emphasis supplied].

Moreover, the state attacks Mountain States' standing to raise constitutional claims on the state's behalf; respondents adopt the state's reasoning. Brief for Colorado, at 30–34. EPA and the state both rely on this Court's decision in Gallagher v. Continental Ins. Co., 502 F.2d

827 (10th Cir. 1974), as authority for the proposition that Mountain States lacks standing to raise claims belonging to the state. There the court held that a group of citizens and taxpayers lacked standing to recover (on behalf of the state of Colorado) alleged overpayments made in connection with a highway project.

\*    \*    \*    \*    \*    \*

Although the state did not challenge the standing of the individual petitioner legislators herein, they have no better claim to standing than Mountain States, under *Gallagher*, the other authorities cited in the state's brief, and the principles discussed above, apply with equal force to the legislators' standing [sic].

Even if state law permitted the petitioner legislators to press the state's constitutional claims, the "prudential concerns" recognized by the Supreme Court in *Duke Power Co., supra*, dictate that this court should not allow the legislators (or Mountain States) standing to raise claims that the state itself declines to raise and in fact opposes.

[Brief of EPA, pp. 29–31].

In addition, EPA contends that no "case or controversy" exists entitling the State of Colorado, as Intervenor, to an advisory opinion. EPA points out that the State of Colorado, through its Attorney General, has taken a position directly contra to that of Petitioners, and accordingly:

Colorado contends that, as far as it is concerned, EPA has not unlawfully trenched upon the state's sovereign rights. Notwithstanding this contention, it urges this court to "set forth the standards according to which EPA must adhere in implementing the sanctions provisions of the Clean Air Act." Colorado's Brief at 17. Colorado makes this request out of its concern that the federal agencies, because of their "tremendous powers" and the states' concomitant dependence on continued receipt of federal funding, might, at some unspecified time in the future, unlawfully invade Colorado's sovereign rights; and, although the state steadfastly maintains the EPA has not

yet done so, it apparently believes that the mere *potential* for future unlawful action by EPA is sufficient justification for this court to sketch the constitutional boundaries of EPA's authority under the Clean Air Act. *See* Brief for Colorado at 9–11, 16 and 17.

The lack of a dispute with regard to the Tenth Amendment issues between the federal government and the only party with standing to raise these issues— the State of Colorado—deprives this case of the indispensable Article III "case or controversy" which is the predicate for the exercise of federal judicial power, and consequently short–circuits further consideration by this court of all Tenth Amendment claims. Therefore, whatever the depths of Colorado's concerns with regard to the potential abuse of power by EPA or other federal agencies, those concerns cannot vest this court with jurisdiction to render an advisory opinion.

\*    \*    \*    \*    \*    \*

In conclusion there is no case or controversy here because Colorado contends that the Clean Air Act passes constitutional muster under the Tenth Amendment and the petitioners lack standing to raise any contrary Tenth Amendment claims. Thus any decision on these issues would be purely advisory and beyond the judicial power of this court under Article III.

[Brief of EPA, pp. 33–35].

The State of Colorado, by and through its Attorney General, contends that Mountain States is without standing to represent the sovereign interest of the State of Colorado in an *ex relatione* capacity:

. . . [A]n action concerning matters of general public welfare is appropriately instituted in the name of the attorney general or in the name of the state ex rel. attorney general. See, *e. g., State ex rel. Taylor v. Lord*, 28 Or. 498, 43 P. 471 (1896); *Coco v. Oden*, 143 La. 718, 79 So. 287 (1918); *State ex rel. Attorney General v. Cunningham*, 81 Wisc. 440, 51 N.W. 724 (1892); *United States v. Throckmorton*, 98 U.S. 61, 70 [25 L.Ed. 93] (1878).

C.R.S. 1973, 24–31–101 *et seq.* provides that the attorney general shall appear for the state in all actions:

> In which the state is a party or is interested when required to do so by the governor.

C.R.S. 1973, 24–31–101(1)(a). In this case, by executive order No. D0030–74 the Governor ordered the attorney general to intervene in this action to represent the interests of the state. (See attached exhibit C.)

Unless a statute provides otherwise, the attorney general has the exclusive right to represent the state in actions to enforce its interests. *State Board of Pharmacy v. Hallett,* 88 Colo. 331, 296 P. 540 (1937). Colorado has passed no legislation authorizing a private person to represent the state in this or any other such action.

A similar issue arose in an action brought by citizens and taxpayers of Colorado seeking recovery of the amounts allegedly unlawfully disbursed in payment of work done on a tunnel construction project. This circuit held that these citizens had no standing to seek to recover these alleged overpayments on behalf of the State of Colorado. [*Gallagher v. Continental Insurance Co.,* 502 F.2d 827 (10th Cir. 1974)]. Characterizing the suit as a derivative action on behalf of the State of Colorado, this circuit found that there was no authority under Colorado law for maintaining such an action.

\* \* \* \* \* \*

Despite its clear lack of authority, petitioner Mountain States Legal Foundation may urge this court to imply authority for its actions from common law cases in which private persons sought to act as relators. Petitioner's argument should be rejected.

The doctrine in Colorado at common law was that a private person could not, as a matter of right, bring an action for wrongs done to the public. Private persons could represent the people as a relator only where the injury, in addition to affecting the public, peculiarly affected

them. *People ex rel. Byers v. Grand River Bridge Co.,* 13 Colo. 11, 21 P. 898 (1889); *People ex rel. Jerome v. Regents of State University,* 24 Colo. 175 [49 P. 286] (1897); *People ex rel. v. Blake,* 128 Colo. 111, 260 P.2d 592 (1953).

The petition for judicial review, filed with this court on December 4, 1979 by petitioner, is utterly devoid of any allegations of fact attempting to demonstrate that Mountain States Legal Foundation has any special interest in this matter other than that of the general public. Thus, even under the common law test, Mountain States Legal Foundation has no standing to represent the state as a relator in this action. *McCamant v. Denver,* 31 Colo.App. 287, 501 P.2d 142 (1972).

Petitioners may also erroneously seek to premise their *ex relatione* status on Colo.R.Civ.P. 106, which provides that if the district attorney declines to bring an action under rule 106(a)(3) it may be brought upon the relation and complaint of any person. Rule[s] 106(a)(3), however, refers only to actions involving usurpation of office or franchise and is irrelevant to the situation herein.

Moreover, even if rule 106 or the common law provided a proper basis for authority for petitioner's attempt to attain *ex relatione* status, it should be noted that the state has not declined to become involved in this action but has intervened as a party. Petitioners may have serious standing problems concerning their right to raise the tenth amendment issue (see respondent's memorandum in opposition to petitioner's motion for stay pending review, pp. 25–28). This does not give them the right to bootstrap themselves, however, into a position whereby, without any authority whatsoever, they purport to represent the state and thus obtain standing to raise issues they would otherwise be unable to raise. See *Gallagher v. Continental Insurance Co., supra.*

[Brief of Intervenor, pp. 30–34].

Mountain States did not specifically address the "standing" issue, apparently of the view that the challenge is without sub-

stance. Contending that "this controversy" calls upon the court to make a major decision regarding the future relationship of the national and state governments [Brief of Petitioners, p. 13], Mountain States urges that the EPA Administrator's action be invalidated under the Administrative Procedure Act, 5 U.S.C. § 706, and that, in addition, relevant portions of the Clean Air Act be declared unconstitutional. Relying heavily on *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), Mountain States argues that the essence of that decision ". . . is that courts must determine whether the national government has exercised its commerce power authority in a manner that *'displaces'* state decisionmaking regarding an integral state government function. This involves a determination of (1) whether an integral function is involved and (2) whether state decisionmaking has been displaced. If both of these factors are present, then the action of the national government is unconstitutional as violative of the tenth amendment." [Brief of Petitioners, p. 15]. [Footnote omitted].

Mountain States, et al., contends that in this case EPA is attempting to interfere in one of the most essential state functions—lawmaking—by imposing severe and unnecessary sanctions against the states, the result of which is to shift decisionmaking from the state to the national government and to destroy the state's autonomy. After recounting the severe impact of the threatened sanctions, i. e., halt to various projects, loss of jobs, serious financial difficulties for local governments, Mountain States concludes: "In short, the EPA sanctions threaten economic havoc for the state, its political subdivisions, and its people. It is difficult to imagine that the state government could compensate for the loss of federal funds or that the economy could adjust to such a setback. Consequently, it is likely that citizens of Colorado would be deprived of essential services." [Brief of Petitioners, p. 10].

### General Principles of Standing

The critical, principal question here is whether *any* of the petitioners qualify as "aggrieved" persons entitled to judicial review of final agency action, or whether the petitioners have presented a *sufficient* "case or controversy" to import justiciability between the petitioners and the respondent within the meaning of Article III of the United States Constitution.

The question of standing involves "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). In *Duke Power Co. v. Carolina Env. Study Group*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), the Supreme Court recognized "injury in fact" as the one constant element in judicial statements concerning standing:

The essence of the standing inquiry is whether the parties seeking to invoke the court's jurisdiction have "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204 [82 S.Ct. 691, 703, 7 L.Ed.2d 663] (1962). As refined by subsequent reformulation, this requirement of a "personal stake" has come to be understood to require not only a "distinct and palpable injury," to the plaintiff, *Warth v. Seldin*, 422 U.S. 490, 501 [95 S.Ct. 2197, 2206, 45 L.Ed.2d 343] (1975), but also a "fairly traceable" causal connection between the claimed injury and the challenged conduct. *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 261 [97 S.Ct. 555, 561, 50 L.Ed.2d 450] (1977).

438 U.S. at p. 72, 98 S.Ct. at p. 2630.

■ "Injury in fact" means concrete and certain harm. It may be the out–of–pocket costs to a business resulting from obedience to a new governmental rule, *Hunt v. Washington Apple Advertising Comm'r*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), or the unwanted result of a government rule

whether or not a pecuniary loss is sustained. *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Even so, in the absence of a specific statutory grant of a right of review, a plaintiff must allege some particularized injury that sets him apart from the man on the street. *United States v. Richardson*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974). Thus, in *National Collegiate Athletic Association v. Califano*, 622 F.2d 1382 (10th Cir. 1980), we held that a plaintiff has standing if he is "injured in fact" by the defendant's conduct and that the "injury in fact" must constitute concrete and certain harm.

■ It is well established that judicial review of final agency action by an "aggrieved" person will not be denied unless there is a persuasive reason to believe that such was the purpose of Congress. *Morris v. Gressette*, 432 U.S. 491, 97 S.Ct. 2411, 53 L.Ed.2d 506 (1977). A party must clearly demonstrate by facts alleged that "he is himself adversely affected" or those he represents have been "injured in fact" by the agency's conduct. *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Data Processing Service v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

### Standing in Relation to Pertinent Statutory Provisions of the Clean Air Act And a Colorado Statute

It is necessary in cases involving "standing" contentions to concentrate on the specific statutory framework from which the challenges have their origin in order to place the issue in proper focus. Thus, in the case at bar, we must first analyze the Clean Air Act in its pertinent parts together with any relevant Colorado statutes.

The [EPA] Administrator is directed to ". . . cooperate with and encourage cooperative activities by all Federal departments and agencies having functions relating to the prevention and control of air pollution, so as to assure the utilization in the Federal air pollution control program . . . [in conjunction with] . . .

cooperative activities by the States and local governments for the prevention and control of air pollution . . ." 42 U.S.C. § 7402(b) and (a). "Each *State* shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State by submitting an implementation plan for such State which will specify the manner in which national primary and secondary ambient air quality standards will be achieved and maintained within each air quality control region in such State." 42 U.S.C. § 7407(a) [emphasis supplied]. The Administrator is directed to make various determinations relative to a State plan which, by the language of the statute must include "the comprehensive measures and requirements" to be approved by the Administrator with an "attainment" date not later than December 31, 1982. 42 U.S.C. § 7410. Should there exist any "nonattainment areas" within a State from and after June 30, 1979, in which construction or modification is not then being pursued, the Administrator contends that he is directed to terminate construction of any major stationary source under 42 U.S.C. § 7410(a)(2)(I), and to withhold certain federal assistance funds from the affected "nonattainment areas", if the Governor of the affected state has not submitted an implementation plan which considers the required elements enumerated in 42 U.S.C. § 7502 or if reasonable efforts toward such submission are not being made after July 1, 1979. 42 U.S.C. §§ 7506(a)(3) and 7616(b)(2). Thus, the Congress expressly authorized the sanctions imposed in this case; furthermore, it is ludicrous to imagine that the Congress did not understand the significance of the economic impact of the funding restrictions it directed.

■ Significantly, the Act deals with compliance requirements beyond state plans and provides for private penalties. The Act mandates exclusive review in the courts of appeals governing the grant or denial of waivers to companies unable to comply with applicable standards, 42 U.S.C. §§ 7411(j), 7412(c), 7413(d) and 7419 and establishes a procedure empowering the Administrator to

impose noncompliance penalties against the affected party following notice and hearing. 42 U.S.C. § 7420. In terms of "citizens suits", they are, in our view, clearly authorized by direct proceedings in the district courts under 42 U.S.C. § 7604 when the EPA Administrator is charged *with failure to perform a non–discretionary duty. See* 38 A.L.R.Fed. 578. In our view, Congress thus restricted citizens' suits to actions seeking to enforce specific non–discretionary clear–cut requirements of the Clean Air Act. *Anaconda Co. v. Ruckelshaus,* 482 F.2d 1301 (10th Cir. 1973).

The EPA Administrator's Final Rulemaking on Approval of the Colorado SIP of October 5, 1979, challenged here, was solely and exclusively directed to the State Plan. The 1977 amendment to the Clean Air Act required that a specific schedule be adopted to establish the inspection/maintenance (I/M) program, as "expeditiously as possible". To be acceptable, an I/M program must achieve the required 25% reduction in both hydrocarbon and carbon monoxide exhaust emissions by 1987. It was in this setting that the EPA Administrator on March 14, 1980, published a final rule, 45 F.R. 16486, disapproving the carbon monoxide and ozone portions of the Colorado State Implementation Plan, invoking the restrictions on construction of major new or modified stationary sources and announcing that it would begin withholding certain financial assistance from the affected "nonattainment areas".

We have heretofore observed that the State of Colorado, by and through its Attorney General, has *in fact* intervened in this case. The position of the State of Colorado is completely in contradiction to that of Mountain States and the twenty-seven members of the Colorado General Assembly on the constitutional and statutory challenges raised by the petitioners. *The sole contention raised by the State of Colorado was that the imposition of the sanctions by the EPA Administrator prior to final adjournment of the 1980 session of the Colorado General Assembly would constitute arbitrary and capricious action by the EPA.* Thus, the State of Colorado, by and through

its chief legal officer, the Attorney General, has elected to disassociate itself with the *contentions raised by petitioners herein involving constitutional and statutory challenges to EPA's actions taken or threatened.* We observe that this posture is one which, at all times, must necessarily have been known to all state officials and to the officers and members of Mountain States. Even so, there is nothing whatsoever in this record indicating that (a) the Governor of Colorado at any time directed the Attorney General to raise the challenges presented here by petitioners, or (b) the General Assembly [or any one of the twenty-seven legislators who appear as petitioners here] requested the Attorney General to prosecute suit against the EPA, notwithstanding the provisions of C.R.S. 1973, 24–31–101(1)(a):

> The attorney general of the state shall be the legal counsel and advisor of each department, division, board, bureau, and agency of the state government other than the legislative branch. He shall attend in person at the seat of government during the session of the general assembly and term of the supreme court *and shall appear for the state and prosecute and defend all actions and proceedings, civil and criminal, in which the state is a party or is interested when required to do so by the governor, and he shall prosecute and defend for the state all causes in the appellate courts in which the state is a party or interested.* [Emphasis supplied].

Attached to Intervenor's Brief as Exhibit "C", is a copy of an Executive Order executed by Governor Richard D. Lamm, dated December 21, 1979, ordering the Attorney General to intervene in this lawsuit pursuant to C.R.S. 1973, 24–31–101(1)(a) as one in which "the State is interested". Intervention was granted on January 30, 1980.

One must necessarily ask: Who represents *the* State of Colorado? In light of the complete, unequivocable conflict in positions heretofore emphasized between petitioners and the State of Colorado, by and through the Attorney General, the issue must be addressed.

## I.

### Standing of Mountain States to Sue for Itself

■ We hold that Mountain States does not have standing to sue in its own right. There is no showing that the challenged EPA actions will in anywise impair the functions and activities of Mountain States. There is no contention that Mountain States will suffer loss of membership, sustain financial loss or any other impairment as a result of the actions of the EPA, whether actually taken or threatened. Furthermore, Mountain States cannot satisfy the standing requirement contained in § 10(a) of the Administrative Procedure Act, 5 U.S.C. § 702:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

We hold that Mountain States has not demonstrated that it has a sufficient "personal stake" in the outcome of the controversy to render itself, as an organization deeply interested in the problem, an "aggrieved person" with a demonstrated "legal wrong" or claimed invasion of a "legal right". *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Sierra Club v. Morton, supra.* Notwithstanding the fact that Mountain States has advanced constitutional claims on behalf of its officers, members, supporters, and the State of Colorado, we conclude that Mountain States has nothing more than an indirect stake in the action. In *Sierra Club v. Morton, supra,* the matter was well articulated:

> The requirement that a party seeking review must allege facts showing that he is himself adversely affected does not insulate executive action from judicial review, nor does it prevent any public interests from being protected through the judicial process. It does serve as at least a rough attempt to put the decision as to whether review will be sought in the hands of those who have a direct stake in the outcome. That goal would be undermined were we to construe APA to authorize judicial review at the behest of organizations or individuals who seek to do no more than vindicate their own value preferences through the judicial processes.

405 U.S. at p. 740, 92 S.Ct. at p. 1368.

In *Natural Res. Def. Coun., Inc. v. United States Env. P. Agcy.*, 481 F.2d 116 (10th Cir. 1973), Judge Breitenstein, writing for this Court, noted that 42 U.S.C. § 1857h–5(b)(1), which was the predecessor to § 7607(b)(1), simply provides that a petitioner seeking review of the EPA Administrator's action in approving or promulgating any implementation plan under § 1857c–5 of the Clean Air Act may do so by filing a petition in the appropriate United States Court of Appeals, without any requirement that the person or organization seeking review is a person "adversely affected or aggrieved" as required under 5 U.S.C. § 702. Notwithstanding the "blanket invitation to all the world to petition a court of appeals for review" under § 1857h–5(b)(1), we held that a party attacking agency action, whether it be in connection with rule making or after an adjudicatory type hearing, must have standing, which, under Article III, requires a showing of injury in fact bringing the party within the zone of interests protected by the Clean Air Act.

## II.

### Standing of Mountain States to Sue For Its Officers, Members and Supporters

We turn now to the question of whether Mountain States has standing to sue on behalf of its officers, members, and supporters who are citizens of and reside in the "nonattainment" areas of the State of Colorado affected by the EPA action, and those officers, members and supporters "in the remainder" of Colorado who are deprived of their constitutional and statutory rights.

■ We hold that there is nothing contained in this record showing that the officers, members and supporters of Mountain States have that necessary "personal stake" demonstrating injury in fact. The only re-

sources they may have committed or advanced are those representing membership fees or tax payments, the former constituting voluntary action unassociated with issues involved here, and the latter in a class common to all taxpayers generally. There is no showing that their activities within the Mountain States organization have been or will be affected in any manner as a result of the challenged EPA actions. There is nothing about the EPA action, including the sanctions, which can be considered compulsion by unwanted and unlawful government edict constituting injury *per se* traceable to the officers, members or supporters of Mountain States. There is no analogy here to that loss of accounts experienced by the apple dealers in *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) or the inability of a builder to undertake a program of low-cost building in an area included in restrictive zoning ordinances, as set forth in *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). In terms of the "legal wrongs" or "zones of interests" tests relative to standing to sue, under the Administrative Procedures Act, individuals, as officers, members and supporters of an organization, must demonstrate that the challenged statutes and/or regulations have some articulable "cause-and-effect" relation to an identifiable "injury" which, in fact, affects them:

> . . . Petitioners must allege facts from which it reasonably could be inferred that, absent the respondents' restrictive zoning practices, there is a substantial probability that they would have been able to purchase or lease . . . and that, if the court affords the relief requested, the asserted inability of petitioners will be removed.

*Warth v. Seldin*, 422 U.S. at p. 504, 95 S.Ct. at p. 2208.

The crux of petitioners' requested legal redress, as identified in the Petition for Review, is an order from this Court setting aside the actions of the Administrator of EPA on a variety of constitutional grounds essentially targeted at the threatened "punitive sanctions against the State of Colorado". Significantly, the Petition states that prior to filing said Petition, Mountain States dispatched a letter to Governor Lamm requesting him "to direct the Attorney General *to protect the interests of the State of Colorado*"; further, both formally and informally, specific requests were made of the Attorney General to "protect the sovereign interests of the State of Colorado from federal government intrusion into the internal affairs of the State" by filing the Petition for Review within the requisite time limit, to-wit, by December 4, 1979. The Petition states that because representatives of the Attorney General's office stated that there was no present intention to challenge the Administrator's rulemaking order of October 5, 1979, ". . . Mountain States Legal Foundation takes it upon itself the responsibility to file this Petition *ex relatione* on behalf of the sovereign State of Colorado. *Should the Governor of the State of Colorado direct the Attorney General to represent the state's interest in this grave constitutional matter, the Mountain States . . . would eagerly welcome his involvement.*" The foregoing is, in our view, an implicit acknowledgment by petitioners that the challenges advanced *by them* are, in reality, [if accepted as true based on the pleadings contained in the Petition] challenges directly affecting the sovereign State of Colorado. As thus cast, these challenges could only be advanced here by the Attorney General. In fact, however, the Attorney General, in intervention, has refused to associate the interests of the State of Colorado with the challenges advanced by petitioners.

In *Gallagher v. Continental Insurance Company*, 502 F.2d 827 (10th Cir. 1974), this Court held that a group of citizens and taxpayers had no standing to recover, *on behalf of the State of Colorado*, alleged overpayments made in connection with a highway project. We there said:

> Plaintiffs urge that as state citizens and taxpayers they may sue for the recovery of unlawfully disbursed funds. Viewed in this light, the suit is a derivative action

to assert state rights. Authority to bring a suit of that nature depends on state law. Colorado has no constitutional or statutory authorization for maintenance of derivative actions on behalf of the state. It has been held that absent statutory authorization citizens and taxpayers may not bring a derivative suit on behalf of the state. . . . In some cases courts have implied such a right. . . In Colorado, the right would have to be implied. We agree with the district court that it is not "the province of the federal judiciary to fashion implied state rights of action." [Citations omitted].
502 F.2d at 832.

The issue of "standing" in a case very similar to the case at bar was before this court in *Natural Res. Def. Coun., Inc., v. United States Env. P. Agcy., supra.* There, the petitioners, although not asserting constitutional issues, did challenge the EPA Administrator's approval of portions of implementation plans submitted under the Clean Air Act by Colorado, New Mexico and Utah. We held that the petitioners were without standing. The petitions for review were dismissed. We there said, in relevant part:

We believe that the question is whether the party attacking agency action has standing, not whether the issue itself is justiciable. . . . [F]actors [to be considered] are whether the attack on agency action is by a person within the zone of protected interests . . . .

We come then to the effect of § 1857h–5(b)(1). By permitting anyone in the world to petition for review of agency action without hindrance or limitation, Congress attempts to authorize private attorney generals to assert a public interest. If Art. III is not controlling, the question is the power of Congress to affect the Court imposed rule of self-restraint. We are helped by no decided cases. . . . Anything which we might say on the rights of private citizens to assert their ideologies in public actions would add little if anything to the literature on the subject.

. . . We believe that any congressional authorization of suits by private attorney generals must be unequivocal and appropriate.

. . . § 1857h–5(b)(1) is not an appropriate authorization. . . . Unrestricted litigation by private persons to assert their own ideologies under a claim of public interest presents the potential of hazardous consequences to our constitutional system based as it is on the concept of separation of powers.

. . . We believe that Art. III is controlling and that petitioners lack standing because they fail to state any injury in fact and hence do not present a case or controversy within the constitutional mandate. If we are wrong in this, we believe that petitioners have no standing because they have alleged nothing which brings them within the zone of interests protected by the Clean Air Act Amendments of 1970. If we are wrong in both of these conclusions . . . we believe that § 1857h–5(b)(1) is ineffective to deny the exercise of judicial restraint in determination of standing in cases like these, and we choose to exercise that restraint.
481 F.2d at pp. 120–121.

We hold that Mountain States is without standing to seek judicial review on behalf of its officers, members and supporters.

### III.

#### *Standing of the Twenty-seven Named Members of the Colorado General Assembly to Sue*

It is the contention of the named members of the Colorado General Assembly that ". . . EPA has entered a sensitive area by telling a state legislature to pass new legislation meeting certain specific requirements . . . The actions of the EPA—requiring passage of legislation and threatening sanctions against the state–have a serious chilling effect upon the legislators' freedom of speech. . . . Compelling an affirmative act of a political or ideological nature is not permitted by the first amendment. *Wooley v. Maynard*, 430 U.S.

705 [97 S.Ct. 1428, 51 L.Ed.2d 752] (1977). . . . The national interest does not outweigh the first amendment interest in preserving the important right of legislators to vote according to the wishes of their constituents, not at the behest of another government agency." [Brief of Mountain States, pp. 33–34].

A private litigant, whether he be a legislator, a citizen or a taxpayer must, in order to have "standing" to sue, demonstrate a personal stake in the outcome, and demonstrate that he is the proper party to request adjudication of the particular issue. *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Federal courts do not have power to render advisory opinions. *F. C. C. v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978).

In *Lamm v. Volpe*, 449 F.2d 1202 (10th Cir. 1971), this Court held, *inter alia*, that the plaintiff, who filed a class action seeking a declaratory judgment that a federal statute constituted an usurpation of the police power reserved to the State of Colorado in violation of the Tenth Amendment, was without "standing". There Lamm (now Governor Lamm) sued individually as a citizen and taxpayer of the State of Colorado and of the United States, *and as a member of the Colorado legislature*. He contended, much in the manner of the twenty–seven legislators in the instant case, that 23 U.S.C. § 131 was unconstitutional as violative of the Tenth Amendment. That provision was enacted as part of the 1965 Highway Beautification Act, which regulated outdoor advertising along federal–aid highways. *It provided that if the Secretary of Transportation decided that any State had not provided "effective control" of outdoor advertising along federal–aid highway systems, the total Federal–Aid Highway Allotment to that State would be reduced 10% per year* [estimated to be $6 million per year to Colorado]. Lamm had introduced bills in the Colorado legislature, in reliance on the State's police power, which apparently would have declared the outdoor advertising adjacent to certain highways, including the federal–aid highway system,

subject to destruction or abatement without compensation as injurious to public safety as a public nuisance. Lamm had contended that the "withholding" statute had, in effect, intimidated the Colorado Legislature and had prevented due consideration of his bills. We held that Lamm lacked standing to raise the Tenth Amendment challenge because he had not demonstrated that Congress, in enacting 23 U.S.C. § 131, *supra*, had exceeded its taxing and spending power delegated to it by Article I, § 8, and that Congress had not thereby invaded the legislative province reserved to the states by the Tenth Amendment. In dicta we observed:

Here the power of regulation has not been preempted by the Congress. But that begs the point. The Congress has clearly determined that the "taking" of outdoor advertisements adjacent to federal–aid highways required "just compensation". The Tenth Amendment has been construed "as not depriving the national government of authority to resort to all means for the exercise of a granted power which are appropriate and plainly adapted to the permitted end." *United States v. Darby*, 312 U.S. 100 [61 S.Ct. 451, 85 L.Ed. 609] . . . (1941). And while the United States is "not concerned with, and has no power to regulate local political activities as such by state officials, it does have power to fix the terms upon which its money allotments to state shall be disbursed." *Oklahoma v. U.S. Civil Service Comm'n.*, 330 U.S. 127, 67 S.Ct. 544, 91 L.Ed. 794 . . . (1947).

\* \* \* \* \* \*

Following oral arguments, Lamm submitted "traditional cases" in further support of his standing contention. He cited *Allen v. Hickel*, 138 U.S.App.D.C. 31, 424 F.2d 944 (1970); *Protestants and Other Americans United for Separation of Church and State v. Watson*, 132 U.S. App.D.C. 329, 407 F.2d 1264 (1968); *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150 [90 S.Ct. 827, 25 L.Ed.2d 184] . . . (1970); and *School Dist. of Abington Tp., Pa. v. Schempp*, 374 U.S. 203 [83 S.Ct. 1560, 10

L.Ed.2d 844] . . . . (1963). These decisions do not aid Lamm. In each case the challenge to the taxing and spending power was anchored to an alleged constitutional provision restricting its exercise. The Tenth Amendment does not raise the challenge.

449 F.2d at pp. 1203–1205.

### Conclusion

The constitutional issues of paramount concern to Mountain States, et al., relate to the rights of the State of Colorado and all of its citizens. They have been invoked by Mountain States, et al., in the context of a federal statute, the Clean Air Act, which requires particular action on the part of the State of Colorado (submission of a SIP which meets approval of the EPA Administrator) and which, if not approved, triggers imposition of sanctions *as a result of the failure of the State to submit a plan meeting EPA standards.* Thus, in truth, the State of Colorado is the real party in interest. C.R.S. 1973, 24–31–101(1)(a) provides that the Attorney General of the State of Colorado is to appear "for the state" in all actions, civil and criminal, in which the State "is a party or interested" when "required to do so by the governor." Here, the Attorney General was directed to intervene on behalf of the State of Colorado by Governor Lamm on the basis that "the State is interested". We must assume, of course, that the absolutely conflicting position posited by the Attorney General to the panoply of serious constitutional and statutory contentions so forcefully advanced by Mountain States, et al., are views shared by Governor Lamm who directed the Attorney General to intervene. The Colorado Supreme Court has held that C.R.S. 1973, 24–31–101(1)(a) grants the Attorney General the exclusive right, in the absence of another statute providing otherwise, to represent the State in actions to protect its interests. *State Board of Pharmacy v. Hallett,* 88 Colo. 331, 296 P. 540 (1937).

Following intervention, the Attorney General vehemently opposed all of the constitutional challenges advanced by petitioners. His sole and only challenge involved the possible imposition of limitations on federal financial assistance and ban on construction. The Attorney General argues that in light of the good faith efforts of the State in achieving compliance, the imposition of sanctions during the 1980 legislative session would be arbitrary, capricious and unreasonable. At no time, did the Colorado General Assembly request the Attorney General to appear for the State and advance the contentions made herein by Mountain States, et al. Nothing in the record indicates the enactment of any resolution of declaration by the Colorado General Assembly indicating a "consensus" with the contentions advanced by the twenty–seven legislators who are petitioners herein. For standing purposes, "abstract injury" does not suffice for the required "injury in fact". *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

■ Thus, on the state of the record before us, we must hold that the *only* party with the requisite "standing" to challenge the actions of the EPA Administrator is the State of Colorado, represented here solely by the Colorado Attorney General by virtue of statutory and executive authority. The general rule is that, by virtue of constitutional and/or statutory provisions or common–law power, the state attorney general, as chief law officer of the state, is the exclusive legal representative of the state in all litigation with regard to matters of public interest, and he alone has the right to represent the state as to litigation involving a subject matter of statewide interest. *See* 7a C.J.S. Attorney General § 11(c) and cases cited; 7 Am.Jur.2d, Attorney General, § 11 and cases cited. Again, we pointedly observe that, with the exception of the threatened imposition of sanctions by EPA, the State of Colorado flatly contradicts the contentions of Mountain States, et al., that the State of Colorado, its citizens and legislators, have suffered any constitutional harm or injury. The Attorney General, to the contrary, vehemently contends that the State of Colorado has not suffered any concrete injury as a result of the EPA Admin-

istrator's actions under authority of the Clean Air Act. "Concrete injury, whether actual or threatened, is that indispensable element of a dispute which serves in part to cast it in a form traditionally capable of judicial resolution." *Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 220–221, 94 S.Ct. 2925, 2932, 41 L.Ed.2d 706 (1974).

We take no position as to the utterly conflicting views involving the constitutional and statutory challenges posited by Mountain States, et al. In light of our ruling on the "standing" issue, the conflict does not present a justiciable case. It does, of course, present sharp political and ideological differences of substantial import. These are not matters, however, properly directed to this Court for resolution in view of the fact that the *only* party with standing to advance them has elected not to do so. The complaints registered herein directed at the alleged unlawful actions of the EPA Administrator are, in reality, complaints against the Congress of the United States which enacted the Clean Air Act, as amended. The 1977 amendments to that Act included the provisions directing administrative imposition of the sanctions.

On June 13, 1980, EPA proposed approval of the Governor's submittal of the revised Colorado SIP relative to the motor vehicle emissions control program and solicited comments on this action. *See* 45 Fed. Reg. 40167. The notice of final rulemaking approving Colorado's automobile exhaust emissions control program for inclusion in its SIP and removing the federal funding and stationary source construction restrictions was executed under date of July 10, 1980. It was published and became effective July 16, 1980. *See* 45 Fed.Reg. 47682. As previously noted, the Colorado Attorney General has taken no position on the mootness issue. We hold that the aforesaid final rulemaking action does, under the circumstances of this case, render any and all contentions raised and advanced by the State of Colorado, as intervenor, moot.

The petition for review is dismissed.