UNITED STATES *v.* MILLER ET AL.

No. 696. Argued March 30, 1939.—Decided May 15, 1939.

*Mr. Gordon Dean* argued the cause, and *Solicitor General Jackson, Assistant Attorney General McMahon,* and *Messrs. William W. Barron, Fred E. Strine, George F. Kneip, W. Marvin Smith,* and *Clinton R. Barry* were on a brief, for the United States.

No appearance for appellees.

MR. JUSTICE McREYNOLDS delivered the opinion of the Court.

An indictment in the District Court Western District Arkansas, charged that Jack Miller and Frank Layton

"did unlawfully, knowingly, wilfully, and feloniously transport in interstate commerce from the town of Claremore in the State of Oklahoma to the town of Siloam Springs in the State of Arkansas a certain firearm, to-wit, a double barrel 12-gauge Stevens shotgun having a barrel less than 18 inches in length, bearing identification number 76230, said defendants, at the time of so transporting said firearm in interstate commerce as aforesaid, not having registered said firearm as required by Section 1132d of Title 26, United States Code (Act of June 26, 1934, c. 737, Sec. 4 [§ 5], 48 Stat. 1237), and not having in their possession a stamp-affixed written order for said firearm as provided by Section 1132c, Title 26, United States Code (June 26, 1934, c. 737, Sec. 4, 48 Stat. 1237) and the regulations issued under authority of the said Act of Congress known as the 'National Firearms Act' approved June 26, 1934, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States." [1]

---

[1] Act of June 26, 1934, c. 757, 48 Stat. 1236–1240, 26 U. S. C. § 1132.

That for the purposes of this Act—

"(a) The term 'firearm' means a shotgun or rifle having a barrel of less than eighteen inches in length, or any other weapon, except

A duly interposed demurrer alleged: The National Firearms Act is not a revenue measure but an attempt to usurp police power reserved to the States, and is therefore unconstitutional. Also, it offends the inhibition of the Second Amendment to the Constitution—"A well regulated Militia, being necessary to the security of a free State, the right of people to keep and bear Arms, shall not be infringed."

a pistol or revolver, from which a shot is discharged by an explosive if such weapon is capable of being concealed on the person, or a machine gun, and includes a muffler or silencer for any firearm whether or not such firearm is included within the foregoing definition, [The Act of April 10, 1936, c. 169, 49 Stat. 1192 added the words] but does not include any rifle which is within the foregoing provisions solely by reason of the length of its barrel if the caliber of such rifle is .22 or smaller and if its barrel is sixteen inches or more in length.

"Sec. 3. (a) There shall be levied, collected, and paid upon firearms transferred in the continental United States a tax at the rate of $200 for each firearm, such tax to be paid by the transferor, and to be represented by appropriate stamps to be provided by the Commissioner, with the approval of the Secretary; and the stamps herein provided shall be affixed to the order for such firearm, hereinafter provided for. The tax imposed by this section shall be in addition to any import duty imposed on such firearm.

"Sec. 4. (a) It shall be unlawful for any person to transfer a firearm except in pursuance of a written order from the person seeking to obtain such article, on an application form issued in blank in duplicate for that purpose by the Commissioner. Such order shall identify the applicant by such means of identification as may be prescribed by regulations under this Act: Provided, That, if the applicant is an individual, such identification shall include fingerprints and a photograph thereof.

"(c) Every person so transferring a firearm shall set forth in each copy of such order the manufacturer's number or other mark identifying such firearm, and shall forward a copy of such order to the Commissioner. The original thereof with stamps affixed, shall be returned to the applicant.

"(d) No person shall transfer a firearm which has previously been transferred on or after the effective date of this Act, unless such

The District Court held that section eleven of the Act violates the Second Amendment. It accordingly sustained the demurrer and quashed the indictment.

The cause is here by direct appeal.

Considering *Sonzinsky* v. *United States* (1937), 300 U. S. 506, 513, and what was ruled in sundry causes aris-

person, in addition to complying with subsection (c), transfers therewith the stamp-affixed order provided for in this section for each such prior transfer, in compliance with such regulations as may be prescribed under this Act for proof of payment of all taxes on such firearms.

"Sec. 5. (a) Within sixty days after the effective date of this Act every person possessing a firearm shall register, with the collector of the district in which he resides, the number or other mark identifying such firearm, together with his name, address, place where such firearm is usually kept, and place of business or employment, and, if such person is other than a natural person, the name and home address of an executive officer thereof: *Provided,* That no person shall be required to register under this section with respect to any firearm acquired after the effective date of, and in conformity with the provisions of, this Act.

"Sec. 6. It shall be unlawful for any person to receive or possess any firearm which has at any time been transferred in violation of section 3 or 4 of this Act.

"Sec. 11. It shall be unlawful for any person who is required to register as provided in section 5 hereof and who shall not have so registered, or any other person who has not in his possession a stamp-affixed order as provided in section 4 hereof, to ship, carry, or deliver any firearm in interstate commerce.

"Sec. 12. The Commissioner, with the approval of the Secretary, shall prescribe such rules and regulations as may be necessary for carrying the provisions of this Act into effect.

"Sec. 14. Any person who violates or fails to comply with any of the requirements of this Act shall, upon conviction, be fined not more than $2,000 or be imprisoned for not more than five years, or both, in the discretion of the court.

"Sec. 16. If any provision of this Act, or the application thereof to any person or circumstance, is held invalid, the remainder of the Act, and the application of such provision to other persons or circumstances, shall not be affected thereby.

"Sec. 18. This Act may be cited as the 'National Firearms Act.' "

ing under the Harrison Narcotic Act [2]—*United States* v. *Jin Fuey Moy* (1916), 241 U. S. 394; *United States* v. *Doremus* (1919), 249 U. S. 86, 94; *Linder* v. *United States* (1925), 268 U. S. 5; *Alston* v. *United States* (1927), 274 U. S. 289; *Nigro* v. *United States* (1928), 276 U. S. 332—the objection that the Act usurps police power reserved to the States is plainly untenable.

In the absence of any evidence tending to show that possession or use of a "shotgun having a barrel of less than eighteen inches in length" at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument. Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense. *Aymette* v. *State*, 2 Humphreys (Tenn.) 154, 158.

The Constitution as originally adopted granted to the Congress power—"To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions; To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress." With obvious purpose to assure the continuation and render possible the effectiveness of such forces the declaration and guarantee of the Second Amendment were made. It must be interpreted and applied with that end in view.

The Militia which the States were expected to maintain and train is set in contrast with Troops which they

---

[2] Act December 17, 1914, c. 1, 38 Stat. 785; February 24, 1919, c. 18, 40 Stat. 1057.

were forbidden to keep without the consent of Congress. The sentiment of the time strongly disfavored standing armies; the common view was that adequate defense of country and laws could be secured through the Militia— civilians primarily, soldiers on occasion.

The signification attributed to the term Militia appears from the debates in the Convention, the history and legislation of Colonies and States, and the writings of approved commentators. These show plainly enough that the Militia comprised all males physically capable of acting in concert for the common defense. "A body of citizens enrolled for military discipline." And further, that ordinarily when called for service these men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time.

Blackstone's Commentaries, Vol. 2, Ch. 13, p. 409 points out "that king Alfred first settled a national militia in this kingdom," and traces the subsequent development and use of such forces.

Adam Smith's Wealth of Nations, Book V, Ch. 1, contains an extended account of the Militia. It is there said: "Men of republican principles have been jealous of a standing army as dangerous to liberty." "In a militia, the character of the labourer, artificer, or tradesman, predominates over that of the soldier: in a standing army, that of the soldier predominates over every other character; and in this distinction seems to consist the essential difference between those two different species of military force."

"The American Colonies In The 17th Century," Osgood, Vol. 1, ch. XIII, affirms in reference to the early system of defense in New England—

"In all the colonies, as in England, the militia system was based on the principle of the assize of arms. This implied the general obligation of all adult male inhabitants to possess arms, and, with certain exceptions, to

cooperate in the work of defence." "The possession of arms also implied the possession of ammunition, and the authorities paid quite as much attention to the latter as to the former." "A year later [1632] it was ordered that any single man who had not furnished himself with arms might be put out to service, and this became a permanent part of the legislation of the colony [Massachusetts]."

Also "Clauses intended to insure the possession of arms and ammunition by all who were subject to military service appear in all the important enactments concerning military affairs. Fines were the penalty for delinquency, whether of towns or individuals. According to the usage of the times, the infantry of Massachusetts consisted of pikemen and musketeers. The law, as enacted in 1649 and thereafter, provided that each of the former should be armed with a pike, corselet, head-piece, sword, and knapsack. The musketeer should carry a 'good fixed musket,' not under bastard musket bore, not less than three feet, nine inches, nor more than four feet three inches in length, a priming wire, scourer, and mould, a sword, rest, bandoleers, one pound of powder, twenty bullets, and two fathoms of match. The law also required that two-thirds of each company should be musketeers."

The General Court of Massachusetts, January Session 1784, provided for the organization and government of the Militia. It directed that the Train Band should "contain all able bodied men, from sixteen to forty years of age, and the Alarm List, all other men under sixty years of age, . . ." Also, "That every non-commissioned officer and private soldier of the said militia not under the controul of parents, masters or guardians, and being of sufficient ability therefor in the judgment of the Selectmen of the town in which he shall dwell, shall equip himself, and be constantly provided with a good fire arm," &c.

By an Act passed April 4, 1786 the New York Legislature directed: "That every able-bodied Male Person, be-

ing a Citizen of this State, or of any of the United States, and residing in this State, (except such Persons as are hereinafter excepted) and who are of the Age of Sixteen, and under the Age of Forty-five Years, shall, by the Captain or commanding Officer of the Beat in which such Citizens shall reside, within four Months after the passing of this Act, be enrolled in the Company of such Beat. . . . That every Citizen so enrolled and notified, shall, within three Months thereafter, provide himself, at his own Expense, with a good Musket or Firelock, a sufficient Bayonet and Belt, a Pouch with a Box therein to contain not less than Twenty-four Cartridges suited to the Bore of his Musket or Firelock, each Cartridge containing a proper Quantity of Powder and Ball, two spare Flints, a Blanket and Knapsack; . . ."

The General Assembly of Virginia, October, 1785, (12 Hening's Statutes) declared, "The defense and safety of the commonwealth depend upon having its citizens properly armed and taught the knowledge of military duty."

It further provided for organization and control of the Militia and directed that "All free male persons between the ages of eighteen and fifty years," with certain exceptions, "shall be inrolled or formed into companies." "There shall be a private muster of every company once in two months."

Also that "Every officer and soldier shall appear at his respective muster-field on the day appointed, by eleven o'clock in the forenoon, armed, equipped, and accoutred, as follows: . . . every non-commissioned officer and private with a good, clean musket carrying an ounce ball, and three feet eight inches long in the barrel, with a good bayonet and iron ramrod well fitted thereto, a cartridge box properly made, to contain and secure twenty cartridges fitted to his musket, a good knapsack and canteen, and moreover, each non-commissioned officer and private shall have at every muster one pound of good

powder, and four pounds of lead, including twenty blind cartridges; and each serjeant shall have a pair of moulds fit to cast balls for their respective companies, to be purchased by the commanding officer out of the monies arising on delinquencies. *Provided,* That the militia of the counties westward of the Blue Ridge, and the counties below adjoining thereto, shall not be obliged to be armed with muskets, but may have good rifles with proper accoutrements, in lieu thereof. And every of the said officers, non-commissioned officers, and privates, shall constantly keep the aforesaid arms, accoutrements, and ammunition, ready to be produced whenever called for by his commanding officer. If any private shall make it appear to the satisfaction of the court hereafter to be appointed for trying delinquencies under this act that he is so poor that he cannot purchase the arms herein required, such court shall cause them to be purchased out of the money arising from delinquents."

Most if not all of the States have adopted provisions touching the right to keep and bear arms. Differences in the language employed in these have naturally led to somewhat variant conclusions concerning the scope of the right guaranteed. But none of them seem to afford any material support for the challenged ruling of the court below.

In the margin some of the more important opinions and comments by writers are cited.[3]

---

[3] Concerning The Militia—*Presser* v. *Illinois,* 116 U. S. 252; *Robertson* v. *Baldwin,* 165 U. S. 275; *Fife* v. *State,* 31 Ark. 455; *Jeffers* v. *Fair,* 33 Ga. 347; *Salina* v. *Blaksley,* 72 Kan. 230; 83 P. 619; *People* v. *Brown,* 253 Mich. 537; 235 N. W. 245; *Aymette* v. *State,* 2 Humphr. (Tenn.) 154; *State* v. *Duke,* 42 Texas 455; *State* v. *Workman,* 35 W. Va. 367; 14 S. E. 9; Cooley's Constitutional Limitations, Vol. 1, p. 729; Story on The Constitution, 5th Ed., Vol. 2, p. 646; Encyclopaedia of the Social Sciences, Vol. X, p. 471, 474.

We are unable to accept the conclusion of the court below and the challenged judgment must be reversed. The cause will be remanded for further proceedings.

MR. JUSTICE DOUGLAS took no part in the consideration or decision of this cause.