**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 29 2001**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

  Plaintiff - Appellee,

v.

             No. 00-6129

JOHN LEE HANEY,

  Defendant - Appellant.

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 99-CR-157-L)**

---

William P. Earley, Assistant Federal Public Defender, Oklahoma City, Oklahoma, for Defendant-Appellant.

Edward J. Kumiega, Assistant United States Attorney (Daniel G. Webber, Jr., United States Attorney, with him on the brief), Oklahoma City, Oklahoma, for Plaintiff-Appellee.

---

Before **EBEL**, **ANDERSON** and **MURPHY**, Circuit Judges.

---

**EBEL**, Circuit Judge.

John Lee Haney was convicted of possessing two machineguns in violation

of 18 U.S.C. § 922(*o*).  On appeal, he asserts that § 922(*o*) violates the Second

Amendment and the Commerce Clause. Both arguments are foreclosed by controlling Tenth Circuit precedent. See United States v. Baer, 235 F.3d 561, 564 (10th Cir. 2000) (Second Amendment); United States v. Wilks, 58 F.3d 1518, 1521 (10th Cir. 1995) (Commerce Clause).

## BACKGROUND

The facts of this case are essentially undisputed. John Lee Haney walked into a police station, engaged an officer in conversation, and told him that he owned semiautomatic and fully automatic guns. He stated that they were not licensed and that the federal government lacks authority to require him to get a license. Through a combination of Haney's consent and a warrant, the authorities found two fully automatic guns in Haney's car and house. Haney also had literature on how to convert a semiautomatic gun to a fully automatic gun. Haney had converted one of the guns himself and had constructed the other out of parts. He admitted possessing them.

Section 922(*o*) of Title 18 of the United States Code provides,

(1)    Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.
(2)    This subsection does not apply with respect to—
    (A)    a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or

>    (B)    any lawful transfer or lawful possession of a machinegun that was lawfully possessed before [May 19, 1986].

A "machinegun" is, among other things, "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."  26 U.S.C. § 5845(b); see also 18 U.S.C. § 921(23) (adopting this definition).  Both of Haney's guns are machineguns.

Haney was indicted for possessing two machineguns in violation of § 922(*o*).  He proceeded to a jury trial, was found guilty, and was sentenced to thirty-three months' imprisonment.

## DISCUSSION

The district court had jurisdiction under 18 U.S.C. § 3231.  We have jurisdiction under 28 U.S.C. § 1291.[1]  We review constitutional challenges to statutes de novo.  United States v. Hampshire, 95 F.3d 999, 1001 (10th Cir. 1996).

---

[1]Haney argues that the federal courts lack jurisdiction over him because the above-cited statutes are unconstitutional.  We reject this contention as frivolous.

I. Second Amendment

The Second Amendment reads, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." Haney argues that by banning possession of machineguns, § 922(*o*) infringes his right to keep and bear arms and hence violates the Second Amendment. We reject this contention as inconsistent with governing case law.

There are two twentieth-century Supreme Court cases discussing the Second Amendment in what appear to be holdings. In United States v. Miller, 307 U.S. 174 (1939), the Court rejected a Second Amendment challenge to a criminal prosecution for transporting an unregistered firearm. The Court held,

> In the absence of any evidence tending to show that possession or use of a 'shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument. Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense.

Id. at 178.

In Lewis v. United States, 445 U.S. 55 (1980), the Court held that the laws prohibiting a felon from possessing a firearm do not violate the Due Process Clause. The Court applied rational-basis scrutiny, noting that the laws "are neither based upon constitutionally suspect criteria, nor do they trench upon any constitutionally protected liberties." Id. at 65 n.8. In support, the Court cited

- 4 -

Miller, which it characterized as holding that "the Second Amendment guarantees no right to keep and bear a firearm that does not have some reasonable relationship to the preservation or efficiency of a well regulated militia." Id. (quotation marks omitted).

Our published Tenth Circuit opinions treat the Second Amendment similarly. In United States v. Oakes, 564 F.2d 384 (10th Cir. 1977), we rejected a Second Amendment challenge to the federal law criminalizing possession of an unregistered machinegun, 26 U.S.C. § 5861(d). We found no evidence that the firearm in question was connected with a militia, even though the defendant was nominally a member of the Kansas militia and the "Posse Comitatus," a militia-type organization registered with the state:

> The purpose of the second amendment as stated by the Supreme Court in United States v. Miller was to preserve the effectiveness and assure the continuation of the state militia. The Court stated that the amendment must be interpreted and applied with that purpose in view. To apply the amendment so as to guarantee appellant's right to keep an unregistered firearm which has not been shown to have any connection to the militia, merely because he is technically a member of the Kansas militia, would be unjustifiable in terms of either logic or policy. This lack of justification is even more apparent when applied to appellant's membership in "Posse Comitatus," an apparently nongovernmental organization. We conclude, therefore, that this prosecution did not violate the second amendment.

Id. at 387 (citations omitted).

Our most recent pronouncement on the Second Amendment is United States v. Baer, 235 F.3d 561 (10th Cir. 2000). In Baer, we rejected a "time-worn"

- 5 -

Second Amendment challenge to the federal felon-in-possession law, noting that "the circuits have consistently upheld the constitutionality of federal weapons regulations like [this one] absent evidence that they in any way affect the maintenance of a well regulated militia." Id. at 564.

Consistent with these cases, we hold that a federal criminal gun-control law does not violate the Second Amendment unless it impairs the state's ability to maintain a well-regulated militia. This is simply a straightforward reading of the text of the Second Amendment. This reading is also consistent with the overwhelming weight of authority from the other circuits. See, e.g., United States v. Napier, 233 F.3d 394, 402 (6th Cir. 2000) (holding that the Second Amendment right "is limited to keeping and bearing arms that have some reasonable relationship to the preservation or efficiency of a well regulated militia" (quotation marks omitted)); Gillespie v. City of Indianapolis, 185 F.3d 693, 711 (7th Cir. 1999) (rejecting a Second Amendment challenge to 18 U.S.C. § 922(g)(9) because the plaintiff "does not argue (and we do not believe under any plausible set of facts that he could) that the viability and efficacy of state militias will be undermined by prohibiting those convicted of perpetrating domestic violence from possessing weapons in or affecting interstate commerce"), cert. denied, 528 U.S. 1116 (2000); United States v. Wright, 117 F.3d 1265, 1272-74 (11th Cir. 1997) (holding that a criminal defendant must demonstrate a

reasonable relationship between possession of a machinegun and the preservation or efficiency of a militia actively trained and maintained by the state), amended on other grounds by 133 F.3d 1412 (11th Cir. 1998); United States v. Rybar, 103 F.3d 273, 286 (3d Cir. 1996) (same); United States v. Hale, 978 F.2d 1016, 1019-20 (8th Cir. 1992) (same).

Applying this standard, it is clear that § 922(*o*) is facially constitutional. Section 922(*o*)(2)(A) sets forth a specific exemption for possession of a machinegun "under the authority of" a state; therefore, that section cannot impair the state's ability to maintain a well-regulated militia. Accord Wright, 117 F.3d at 1274 n.19. Haney does not contend that his possession of the machineguns at issue in this case was under the authority of Oklahoma.

Nor has Haney proven several facts logically necessary to establish a Second Amendment violation. As a threshold matter, he must show that (1) he is part of a state militia; (2) the militia, and his participation therein, is "well regulated" by the state; (3) machineguns are used by that militia; and (4) his possession of the machinegun was reasonably connected to his militia service. None of these are established.

The militia of the Second Amendment is a governmental organization: The Constitution elsewhere refers to "the Militia of the several States," Art. II, § 2, and divides regulatory authority over the militia between the federal and state

- 7 -

governments, Art. I, § 8.  See also Perpich v. Dep't of Defense, 496 U.S. 334, 345-46 (1990) (describing the "dual enlistment" provisions of the militia statutes).  Thus, the militia does not include the private anti-government groups that sometimes refer to themselves as "militias."  Haney is not part of the "well regulated" militia, that is, a "militia actively maintained and trained by the states," Wright, 117 F.3d at 1272.  At best, Haney claims to be a member of the "unorganized" (and therefore not a "well regulated" state) militia.  See Okla. Stat. Ann. Tit. 44, § 41 (dividing the population of able-bodied persons between the ages of seventeen and seventy into the National Guard, the Oklahoma State Guard, and the "Unorganized Militia").  Haney does not claim to be a member of the National Guard or the Oklahoma State Guard, and he has submitted no evidence that the Oklahoma unorganized militia and his participation therein are well-regulated by the State of Oklahoma.  Accord Wright, 117 F.3d at 1274 ("[T]he substantial segment of the population comprising the unorganized militia is not well regulated as that term was intended by the drafters of the Second Amendment."); see also Oakes, 564 F.2d at 387 (noting that technical membership in the state militia is insufficient to show a Second Amendment violation); Hale, 978 F.2d at 1020 (same).  Nor has Haney submitted any evidence that machineguns of the sort he possessed are used by the militia, or that his possession was connected to any sort of militia service.

In sum, § 992(*o*) does not impair the state's ability to maintain a well-regulated militia and therefore does not violate the Second Amendment.

II. Commerce Clause

Article I, Section 8 of the Constitution grants Congress the power "[t]o regulate Commerce . . . among the several States."  Under this Commerce Clause, Congress may regulate three broad categories of activities:

> First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce.

United States v. Lopez, 514 U.S. 549, 558-59 (1995) (citations omitted).

Haney argues that § 922(*o*) exceeds Congress's power under the Commerce Clause by regulating purely intrastate activity.  We note at the outset that all of the courts of appeals that have addressed this issue have upheld § 922(*o*) as a valid enactment under the Commerce Clause.  See United States v. Franklyn, 157 F.3d 90 (2d Cir. 1998); United States v. Wright, 117 F.3d 1265 (11th Cir. 1997), amended on other grounds, 133 F.3d 1412 (11th Cir. 1998); United States v. Knutson, 113 F.3d 27 (5th Cir. 1997) (per curiam); United States v. Rybar, 103 F.3d 273 (3d Cir. 1996); United States v. Kenney, 91 F.3d 884 (7th Cir. 1996);

United States v. Beuckelaere, 91 F.3d 781 (6th Cir. 1996); United States v. Rambo, 74 F.3d 948 (9th Cir. 1996); United States v. Wilks, 58 F.3d 1518 (10th Cir. 1995); United States v. Hale, 978 F.2d 1016 (8th Cir. 1992); cf. Navegar, Inc. v. United States, 192 F.3d 1050, 1055 (D.C. Cir. 1999) (upholding a federal ban on possessing semiautomatic assault weapons and comparing that law to § 922(*o*)), cert. denied, 531 U.S. 816 (2000).

Because § 922(*o*) contains no jurisdictional element (such as a requirement that the possession be in or affecting interstate commerce), we treat Haney's challenge as a facial challenge. See United States v. Riddle, 249 F.3d 529, 539 (6th Cir. 2001) ("Any as-applied challenge is irrelevant since [the statute] does not contain a jurisdictional element and the prosecution need not put on evidence of a particular connection with interstate commerce."). As such, "[o]ur task is merely to determine whether Congress could have had a rational basis to support the exercise of its commerce power; and, further, that the regulatory means chosen were reasonably adapted to the end permitted by the Constitution." Kenney, 91 F.3d at 886 (citing Hodel v. Va. Surface Mining & Reclamation Ass'n, 452 U.S. 264, 276 (1981)); see also Goetz v. Glickman, 149 F.3d 1131, 1135 (10th Cir. 1998). "Due respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." United

States v. Morrison, 529 U.S. 598, 607 (2000) (noting also the "presumption of constitutionality" that congressional legislation possesses); see also United States v. Kirk, 105 F.3d 997, 999 (5th Cir. 1997) (evenly divided en banc court) (opinion of Higginbotham, J.) ("This deferential standard [in reviewing congressional legislation against a Commerce Clause challenge] does not insist that Congress actually make factual findings. To the contrary, its tolerance of hypothetical, judicially supposed purposes and means gives the rational basis standard its deferential character.").

In a post-Lopez decision, we upheld the constitutionality of § 922(o) and distinguished it from the statute struck down in Lopez, § 922(q), which prohibited possession of a firearm in a school zone:

> Unlike § 922(q), § 922(o) embodies a proper exercise of Congress' power to regulate "things in interstate commerce" – i.e., machineguns. Whereas § 922(q) sought to regulate an activity which by its nature was purely intrastate and could not substantially affect commerce even when incidents of those activities were aggregated together, § 922(o) regulates machineguns, which by their nature are a commodity transferred across state lines for profit by business entities. The interstate flow of machineguns not only has a substantial effect on interstate commerce, it is interstate commerce. Section 922(o) regulates this extensive, intricate, and definitively national market for machineguns by prohibiting the transfer and possession of machineguns manufactured after May 19, 1986. As such, § 922(o) represents Congressional regulation of an item bound up with interstate attributes and thus differs in substantial respect from legislation concerning possession of a firearm within a purely local school zone.

Wilks, 58 F.3d at 1521 (citations, quotation marks, and alterations omitted).

A.  Things in Interstate Commerce

Wilks holds that machineguns are inherently "things in interstate commerce" and therefore may be regulated under the second Lopez category.  We reject Haney's argument that Wilks has been undermined by recent Supreme Court cases.  United States v. Morrison discussed only the third Lopez category, not the second category relied upon in Wilks.  See 529 U.S. at 609.  Jones v. United States, 529 U.S. 848 (2000), merely interpreted the scope of the jurisdictional element ("affecting interstate or foreign commerce") in the arson statute, 18 U.S.C. § 844(i).  See 529 U.S. at 850.  That decision is statutory and avoids the constitutional question.  See id. at 858.  Section 922(*o*) has no jurisdictional element, and Jones is therefore inapposite.

Haney also seeks to distinguish Wilks as applying only to interstate possession or transfer of machineguns.  The Wilks opinion, however, recited no facts showing that the two machineguns found in a search of Wilks's home themselves traveled in or otherwise affected interstate commerce.  To the contrary, Wilks simply describes a machinegun as "an item bound up with interstate attributes," suggesting that an individualized inquiry is inappropriate. 58 F.3d at 1521.  Wilks therefore cannot be distinguished on this basis.

B. Activities That Substantially Affect Interstate Commerce

Moreover, we believe § 922(*o*) can also properly be sustained under the third Lopez category as regulating activities that substantially affect interstate commerce.[2]  Indeed, Wilks suggested this basis too in relying on the "extensive, intricate, and definitively national market for machineguns" and noting that machineguns "by their nature are a commodity transferred across state lines for profit by business entities."  58 F.3d at 1521.  We are guided in this approach by the Supreme Court's recent decisions in Lopez and Morrison.

Lopez invalidated 18 U.S.C. § 922(q), which criminalized possession of a firearm in a school zone, finding that such possession "is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce."  514 U.S. at 567.  Morrison similarly struck down 42 U.S.C. § 13981, a provision of the Violence Against Women Act that created a federal civil remedy for gender-motivated violence.  The Supreme Court refused to allow Congress to regulate "noneconomic, violent criminal conduct based

---

[2]Some courts have reached a similar conclusion under the first Lopez category, regulation of the channels of interstate commerce.  See, e.g., Beuckelaere, 91 F.3d at 784; Rambo, 74 F.3d at 952 (9th Cir. 1996).  But see Kenney, 91 F.3d at 889 (criticizing this approach and suggesting that the analysis must be done under the third category).  We do not discuss the first category here but note that the Lopez categories necessarily overlap to some extent.  See United States v. Schaffner, 258 F.3d 675, 2001 WL 827618, at *4 (7th Cir. 2001).

solely on that conduct's aggregate effect on interstate commerce." 529 U.S. at 617.

Both Lopez and Morrison reaffirmed, however, that "[w]here economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained." Lopez, 514 U.S. at 560; see also Morrison, 529 U.S. at 610. The Lopez Court also suggested that a statute would be sustained if it was "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." 514 U.S. at 561; cf. Groome Res. v. Parish of Jefferson, 234 F.3d 192, 205 (5th Cir. 2000) (holding that an activity is "economic" if it is either "any sort of economic enterprise, however broadly one might define those terms," or "an essential part of a larger regulation of economic activity").

1. Essential Part of a Regulatory Scheme

We hold that banning possession of post-1986 machineguns is an essential part of the federal scheme to regulate interstate commerce in dangerous weapons. Congress has found that "firearms and ammunition move easily in interstate commerce," § 922(q)(1)(C), and has therefore taken numerous steps to regulate these transactions. Machineguns legally possessed may not be transferred in commerce without approval from the Secretary of the Treasury, and a substantial tax must be paid. 26 U.S.C. §§ 5811(a), 5812(a). See generally David T. Hardy,

The Firearms Owners' Protection Act: A Historical and Legal Perspective, 17 Cumb. L. Rev. 585, 589-605 (1987) (detailing the history of federal gun-control legislation). Thus, there is a general regulatory scheme to regulate interstate commerce in firearms, particularly including machineguns.

But focusing on weapons only as they move in interstate commerce has not been effective to curb the interstate flow of these weapons. Rather, Congress has found it necessary also to regulate <u>intra</u>state activities as a way of addressing the <u>inter</u>state market in machineguns. Similar statutes regulate intrastate possession of other extremely dangerous devices such as biological weapons, 18 U.S.C. § 175(a), nuclear material, 18 U.S.C. § 831(a), and semiautomatic assault weapons, 18 U.S.C. § 922(v)(1). There is no question that the market in firearms generally is heavily interstate – indeed, international – in character. <u>E.g.</u>, 18 U.S.C. § 922(q)(1)(D) (finding that "even before the sale of a firearm, the gun, its component parts, ammunition, and the raw materials from which they are made have considerably moved in interstate commerce"); S. Rep. No. 90-1097 (1968), <u>reprinted in</u> 1968 U.S.C.C.A.N. 2112, 2164-65 (noting testimony that "50 to 80 percent of the crime guns that are confiscated each year are foreign imports" and that "90 out of every 100 crime guns confiscated in Detroit are not purchased and registered in Michigan and that the prime source of these crime guns is by

purchases in neighboring Ohio, where controls on firearms are minimal").[3]

Because of the ease of moving weapons across state and national lines, Congress

has rationally concluded that it cannot rely on the states to control the market in

these devices by themselves.  See Omnibus Crime Control and Safe Streets Act of

1968, Pub. L. No. 90-351, § 901(a)(1), 82 Stat. 197, 225 ("[T]here is a

widespread traffic in firearms moving in or other affecting interstate or foreign

commerce . . . .").

The First Circuit has explained this reasoning further in upholding the

constitutionality of § 922(x)(2), the provision of the Youth Handgun Safety Act

(YHSA) that prohibits a juvenile from possessing a handgun.  United States v.

Cardoza, 129 F.3d 6, 12 (1st Cir. 1997).  After noting that "the Commerce power

_____

[3]In Commerce Clause challenges to § 922(*o*), we and other circuits have referred to legislative history not only of § 922(*o*) itself, but also of other federal gun legislation generally.  E.g., Wilks, 58 F.3d at 1521 n.4; Franklyn, 157 F.3d at 95; Rybar, 103 F.3d at 279; Kenney, 91 F.3d at 889-90.  We have concluded that § 922(*o*) is closely intertwined with other federal gun legislation and that Congress should not be required to rearticulate its old findings every time it adds an additional provision.  Furthermore, because a Commerce Clause justification for legislation can be any rational basis, whether or not so articulated by Congress, we refer to congressional findings in the context of other gun legislation for rational arguments in support of the gun provision at issue.  Cf. Lopez, 514 U.S. at 562-63 (stating that "Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce," particularly when a "substantial effect [is] visible to the naked eye").

has long been exercised to regulate the national market in firearms," id., the court explained:

> [W]e think the possessory prong of the YHSA . . . is "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." This is so because the YHSA was designed expressly to stop the commerce in handguns with juveniles nationwide. Part of this regulatory approach involves the suppression of the demand for such handguns. The YHSA can be thus seen as criminalization of the two points where the prohibited commerce finds its nexus[:] the demand for the firearms (possession), and the sale or transfer designed to meet that demand. The two prohibitions go hand in hand with one another. Invalidation of one half of the equation would likely have deleterious effects on the efficacy of the legislation. In this regard, we think it clear that given Congress' express purpose, its decision to punish both the supply (sale or transfer) and demand (possession) sides of the market is a means reasonably calculated to achieve its end.

Id. (citations and alterations omitted). Similarly, the possessory component of § 922(*o*) goes "hand in hand" with the prohibition on transfers and is therefore an "essential part" of the larger regulatory scheme. Accord Franklyn, 157 F.3d at 95 ("[Section] 922(*o*) is integral to an overall system for the federal regulation of firearms."); Kenney, 91 F.3d at 890 ("Permitting unregulated intrastate possessions . . . of machine guns . . . indirectly undermines, via a market theory, the effectiveness of the federal attempt to regulate interstate commerce in machine guns. In other words, the intrastate activity 'affects' the interstate commerce . . . ."); Beukelaere, 91 F.3d at 786 ("[T]here is a rational basis to conclude that federal regulation of intrastate incidents of transfer and possession

of machineguns is essential to effective control of interstate incidents of traffic in machineguns."); see also Wilks, 58 F.3d at 1522 ("Congress prohibited the transfer and possession of most post-1986 machineguns not merely to ban these firearms, but rather, to control their interstate movement by proscribing transfer or possession.").

2. Economic Activity Substantially Affecting Interstate Commerce

The third Lopez category allowing regulation of intrastate economic activity requires that such activity have a substantial effect on interstate commerce. We agree with the majority of circuits that, after Morrison, have concluded "economic activity" should be read broadly to include activities that are closely linked to commercial transactions. Cf. Groome Res., 234 F.3d at 208; United States v. Gregg, 226 F.3d 253, 262 (3d Cir. 2000), cert. denied, 121 S. Ct. 1600 (2001); Gibbs v. Babbitt, 214 F.3d 483, 491 (4th Cir. 2000), cert. denied, 121 S. Ct. 1081 (2001). Possession of an illegal machinegun is closely linked to the commercial transaction of transferring an illegal machinegun. It is unlike possession of a gun in a school zone, which restricts only the location in which a transfer could take place by restricting gun possession at that location, and therefore it has a more attenuated connection to commercial transactions. Cf. Navegar, 192 F.3d at 1059 ("Manufacture, transfer and possession are activities that not only substantially affect interstate commerce . . . but are also the

necessary predicates to such commerce."). We conclude that § 922(*o*) is "economic activity" for purposes of the third Lopez category.

Even purely intrastate possession and transfers of machineguns have a substantial effect on interstate commerce. As noted above, Congress has concluded that regulating intrastate possession and transfers is necessary to control the interstate market in these weapons. Moreover, Congress has found that the interstate market itself is significant. It follows that intrastate possession and transfers have a substantial effect on interstate commerce.

Although there is virtually no legislative history explaining § 922(*o*) itself, see Wilks, 58 F.3d at 1519, we find support for the rationality of these conclusions in the legislative history of § 922(v), which bans manufacturing, transferring, or possessing certain semiautomatic assault weapons.[4] To restrict interstate commerce in semiautomatic assault weapons, particularly into states that prohibit them, Congress "imposed criminal liability for those activities which fuel the supply and demand for such weapons. The ban on possession is a measure intended to reduce the demand for semiautomatic assault weapons."

---

[4]The markets for semiautomatic weapons and machineguns are closely linked because of the ease with which a semiautomatic weapon can be converted to fully automatic (as Haney did to one of the weapons in this case). See H.R. Rep. No. 99-495, at 28, reprinted in 1986 U.S.C.C.A.N. 1327. Indeed, simple wear and tear can make a machinegun out of a semiautomatic weapon. See Staples v. United States, 511 U.S. 600, 615 (1994). Thus, restrictions on semiautomatic assault weapons are closely related to restrictions on machineguns.

Navegar, 192 F.3d at 1058 (quotation marks omitted). After surveying the extensive congressional testimony on how common it was for individuals to purchase semiautomatic assault weapons in one state and bring them to another, the Navegar court concluded that "Congress was well aware that there was significant interstate traffic in semiautomatic assault weapons and that state laws and existing federal firearms regulation were inadequate to control the flow of these weapons across state lines." Id. at 1060. It likewise is rational for Congress to conclude that intrastate machinegun possession substantially affects interstate commerce in those weapons.[5]

## CONCLUSION

We hold that 18 U.S.C. § 922(*o*) is constitutional and does not violate either the Second Amendment or the Commerce Clause, and therefore we AFFIRM Haney's conviction.

---

[5]We note that some courts seem to rely on the costs of violence associated with the use of weapons. Cf. Rybar, 103 F.3d at 281; United States v. Synnes, 438 F.2d 764, 768 (8th Cir. 1971), vacated, 404 U.S. 1009 (1972). After Morrison, it appears we may not rely solely on this to find a substantial effect on interstate commerce, see 529 U.S. at 617, but it is unclear whether we may consider it as an additional effect on interstate commerce. We do not decide this issue because we find a substantial effect even without considering this evidence.