**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 24 2004**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

DALE PARKER,

      Defendant-Appellant.

No. 03-4119

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 2:03-CR-139-TC)

Submitted on the Briefs:[*]

Mary C. Corporon, Corporon & Williams, P.C., Salt Lake City, Utah, for the defendant-appellant.

Paul M. Warner, United States Attorney, and Diana Hagen, Assistant United States Attorney, Salt Lake City, Utah, for the plaintiff-appellee.

Before **KELLY**, **McWILLIAMS** and **BRISCOE,** Circuit Judges.

**BRISCOE**, Circuit Judge.

---

    [*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Defendant Dale Parker was found guilty under the Assimilative Crimes Act (ACA), 18 U.S.C. § 13, of carrying a loaded firearm in a vehicle or on a public street, in violation of Utah Code Ann. § 76-10-505.[1]  He contends his conviction violates the Second and Tenth Amendments.  We affirm as to Parker's Second Amendment claim, but dismiss his Tenth Amendment claim for lack of standing.

I.

The facts of this case are undisputed.  On October 3, 2002, Parker drove his pickup truck onto the Dugway Proving Ground in Utah to perform civilian contract work.  The front gate was located inside the Dugway Proving Ground, and warning signs posted at the front gate stated: "Warning U.S. Army boundary.  All persons are subject to all regulations.  Persons and vehicles are subject to search upon entry into and exit from Dugway Proving Grounds and while within the boundary of this military reservation based upon probable cause or military necessity."  App. at 8-9.  As a result of a random search, Parker's pickup was stopped at the gate and searched by Specialist Jessie James Lynch.  Lynch found a loaded .38 caliber revolver under the seat of Parker's pickup.  Parker was detained at the gate and then transported to the military police department where he was interviewed.  In Parker's sworn statement, he stated: "I forgot I had my

---

[1]  Utah Code Ann. § 76-10-505 states: "(1) Unless otherwise authorized by law, a person may not carry a loaded firearm: (a) in or on a vehicle; (b) on any public street; or (c) in a posted prohibited area.  (2) A violation of this section is a class B misdemeanor."

revolver in my truck when I drove on the facility. Had I remembered, I would have declared it at the gate." Id. at 27.

Prior to trial, Parker filed a motion to dismiss the charge, claiming the ACA, as applied to him, violated his Second Amendment right to bear arms and that authority to regulate the right to bear arms is reserved to the states under the Tenth Amendment. The magistrate judge denied Parker's motion to dismiss and he was tried and found guilty by the magistrate. The court ordered Parker to pay a $90 fine and a $10 special assessment fee. Pursuant to 18 U.S.C. § 3402 and Federal Rule of Criminal Procedure 58(g)(2)(B), Parker appealed the magistrate's order of conviction to the district court. Upon request by the district court, Parker refiled his motion to dismiss, which was again denied.

II.

On appeal, Parker contends his prosecution pursuant to the ACA violates his right to keep and bear arms under the Second Amendment. He also contends the United States lacks constitutional authority to charge him in federal court with violating a state gun control statute because the Tenth Amendment reserves the right to regulate arms to the states. As these are constitutional challenges to a statute, we apply de novo review. See United States v. Morris, 247 F.3d 1080, 1085 (10th Cir. 2001).

*Assimilative Crimes Act*

We begin by briefly reviewing the purpose and text of the ACA. "The purpose of the ACA is to borrow state law to fill gaps in the federal criminal law that applies on

3

federal enclaves." United States v. Adams, 140 F.3d 895, 896 (10th Cir. 1998). The

ACA thus provides "a method of punishing a crime committed on government

reservations in the way and to the extent that it would have been punishable if committed

within the surrounding jurisdiction." Id. (internal quotation omitted). To achieve these

ends, the ACA states:

> (a) Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided in section 7 of this title . . . is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State . . . in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

18 U.S.C. § 13(a). Section 7 of Title 18 defines the special maritime and territorial

jurisdiction of the United States as including:

> (3) Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building.

18 U.S.C. § 7. As applied here, the ACA enabled the federal government to charge

Parker with a violation of Utah criminal law when that violation was committed on

federal property.

*Second Amendment*

"A well regulated Militia being necessary to the security of a free State, the right

of the people to keep and bear Arms, shall not be infringed." U.S. Const. amd. II.

4

Whether a federal prosecution pursuant to the ACA for violating a state gun control statute violates an individual's Second Amendment rights is an issue of first impression.

Our analysis is guided by the Supreme Court's ruling in United States v. Miller, 307 U.S. 174 (1939). In Miller, the defendants, unrestricted private citizens, were indicted for violating the National Firearms Act (Act), 26 U.S.C. § 1132(c)-(d) (1934) as a result of (1) transporting an unregistered double barrel 12-gauge shotgun in interstate commerce, and (2) not having in their possession a stamped written order permitting possession of the firearm. The defendants filed a motion to quash the indictment and alleged the Act was unconstitutional because it violated the Second Amendment. The district court agreed with the defendants and granted their motion. The Supreme Court reversed, holding:

> In the absence of any evidence tending to show that possession or use of a "shot gun having a barrel of less than eighteen inches in length" at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument. Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense.

307 U.S. at 178. Miller has been interpreted by this court and other courts to hold that the Second Amendment does not guarantee an individual the right to keep and transport a firearm where there is no evidence that possession of that firearm was related to the preservation or efficiency of a well-regulated militia. See Lewis v. United States, 445 U.S. 55, 65 n.8 (1980) (citing Miller for proposition that "the Second Amendment

guarantees no right to keep and bear a firearm that does not have some reasonable relationship to the preservation or efficiency of a well regulated militia");[2] see also Silveira v. Lockyer, 312 F.3d 1052, 1061 (9th Cir. 2003) (referring to Miller's implicit rejection of traditional individual rights position); Love v. Pepersack, 47 F.3d 120, 124 (4th Cir. 1995) ("Since [Miller], the lower federal courts have uniformly held that the Second Amendment preserves a collective, rather than individual, right."); United States v. Toner, 728 F.2d 115, 128 (2d Cir. 1984) (interpreting Miller to stand for rule that, absent reasonable relationship to preservation of well-regulated militia, there is no fundamental right to possess firearm); United States v. Oakes, 564 F.2d 384, 387 (10th Cir. 1977) (analyzing Miller and concluding that "[t]o apply the amendment so as to guarantee appellant's right to keep an unregistered firearm which has not been shown to have any connection to the militia, merely because he is technically a member of the Kansas militia, would be unjustifiable in terms of either logic or policy"); but see United States v. Emerson, 270 F.3d 203, 226 (5th Cir. 2001) (reading Miller as indecisive and, at best, supporting an individual's right to bear arms).

Drawing on Miller, we repeatedly have held that to prevail on a Second Amendment challenge, a party must show that possession of a firearm is in connection

---

[2] In Lewis, the Court held that laws which prohibit a felon from possession a firearm do not violate the Due Process Clause. Although the Court did not address the Second Amendment directly, it applied rational-basis scrutiny, noting the laws "are neither based upon constitutionally suspect criteria, nor do they trench upon any constitutionally protected liberties." 445 U.S. at 65 n.8.

with participation in a "well-regulated" "state" "militia." See United States v. Haney, 264 F.3d 1161, 1165 (10th Cir. 2001) (holding "that a federal criminal gun-control law does not violate the Second Amendment unless it impairs the state's ability to maintain a well-regulated militia"); Oakes, 564 F.2d at 387 (stating "purpose of the second amendment . . . was to preserve the effectiveness and assure the continuation of the state militia"). Applying this principle, in Haney we set out a four-part test a party must satisfy to establish a Second Amendment violation: "As a threshold matter, [a party] must show that (1) he is part of a state militia; (2) the militia, and his participation therein, is 'well regulated' by the state; (3) [guns of the type at issue] are used by that militia; and (4) his possession of the [the gun at issue] was reasonably connected to his militia service." 264 F.3d at 1165. See also United States v. Bayles, 310 F.3d 1302, 1307 (10th Cir. 2002) (applying Haney to uphold federal law restricting a person subject to a domestic violence protective order from possessing a firearm); United States v. Graham, 305 F.3d 1094, 1106 (10th Cir. 2002) (applying Haney to find law banning sale of explosive devices does not infringe upon person's Second Amendment rights). Unless Parker can satisfy these four criteria, he cannot prevail on his Second Amendment claim. Notably, Parker has presented no evidence tending to show that he meets any of the Haney criteria.

Although our prior opinion in Haney would guide us to an affirmance of Parker's conviction, he urges us to reverse the district court and adopt the reasoning found in United States v. Emerson, 270 F.3d 203 (5th Cir. 2001). In Emerson, the court concluded

that the Second Amendment confers an individual right to bear arms, apart from any connection to a state-run militia.[3] The court held that the Second Amendment "protects the right of individuals, including those not then actually a member of any militia or engaged in active military service or training, to privately possess and bear their own firearms." 270 F.3d at 260. The Emerson court reached this conclusion by reading Miller narrowly and concluding Miller did not hold that the Second Amendment only protects the right to bear arms in the context of a militia. The court concluded that "the Second Amendment protects the right of individuals to privately keep and bear their own firearms that are suitable as individual, personal weapons and are not of the general kind or type excluded by Miller, regardless of whether the particular individual is then actually a member of a militia." 270 F.3d at 264.

We conclude Parker's reliance on Emerson is unavailing for several reasons. First, we cannot rely on a ruling from another circuit when this court has ruled to the contrary. Parker's reliance on Emerson is foreclosed by this court's rulings in Bayles, Graham, and

---

[3] In addressing the scope of the Second Amendment, the Emerson court agreed with the district court that the Second Amendment provides an *individual right* as opposed to a pure collective right to bear arms. The court ultimately reversed the district court because it concluded that, even though the defendant had an individual right to bear arms, that right reasonably could be limited where a restraining order had been entered against him for threats of domestic violence. Beyond this distinction, however, it is a mistake to read the decision, as Parker states, as "reversing" the district court on the Second Amendment interpretation because the courts agreed on Parker's central point – that the Second Amendment should be read as conferring *individual* rights. Therefore, for the purposes of considering Parker's claim, we focus upon the Fifth Circuit's more comprehensive discussion in lieu of that provided by the district court.

Haney, where we held that absent a showing that a person is part of a well-regulated state-run militia, the Second Amendment does not establish a citizen's right to possess a firearm. Second, the Fifth Circuit stands alone in its interpretation of the Second Amendment as conferring an individual right to bear arms. In contrast, the Fourth, Sixth, Seventh, and Ninth Circuits have adopted the most restrictive interpretation (also known as "the collective rights model") of the Second Amendment. Under "the collective rights model," the Second Amendment never applies to individuals but merely recognizes the state's right to arm its militia. See Gillespie v. City of Indianapolis, 185 F.3d 693 (7th Cir. 1999); Hickman v. Block, 81 F.3d 98 (9th Cir. 1996); Love, 47 F.3d 120; United States v. Warin, 530 F.2d 103 (6th Cir. 1976); see also United States v. Price, 328 F.3d 958, 961 (7th Cir. 2003) (rejecting reasoning adopted in Emerson). Similarly, in addition to this court, the First, Third, Eighth, and Eleventh Circuits have all adopted a "sophisticated collective rights model." Under this interpretation of the Second Amendment, an individual has a right to bear arms, but only in direct affiliation with a well-organized state-supported militia. See United States v. Wright, 117 F.3d 1265 (11th Cir. 1997); United States v. Rybar, 103 F.3d 273 (3d Cir. 1996); United States v. Hale, 978 F.2d 1016 (8th Cir. 1992); Cases v. United States, 131 F.2d 916 (1st Cir. 1942).

Third, putting aside the fact that Miller requires that a party have some connection to a state-run militia, even the Fifth Circuit's most narrow interpretation of Miller does not support Parker's claim. To the extent Miller only stands for the rule that a sawed-off

9

shotgun is not a military firearm and therefore not covered by the Second Amendment, Parker has presented no evidence that his revolver would come within the category of arms used by the military. To the contrary, at trial, Officer Michael Palhegyi, who was part of the military police unit that took Parker into custody, testified that Parker's firearm was "not considered a military grade weapon" and, instead, more commonly was used for personal defense or target practice. App. at 30. We conclude Parker's prosecution by the United States pursuant to the ACA did not violate the Second Amendment.

*Tenth Amendment*

We do not reach the merits of Parker's argument that his federal prosecution violated the Tenth Amendment because we conclude sua sponte that Parker lacks standing as a private citizen to pursue this claim. See Rector v. City & County of Denver, 348 F.3d 935, 942 (10th Cir. 2003) ("Standing . . . raises jurisdictional questions and we are required to consider the issue sua sponte to ensure that there is an Article III case or controversy before us.").

In Mountain States Legal Foundation v. Costle, 630 F.2d 754, 761 (10th Cir. 1980), we held that private plaintiffs do not have standing to bring Tenth Amendment claims when their interests are not aligned with the state's interests.[4] In Costle, the EPA

---

[4] There is presently a split among circuits on the question of whether the Tenth Amendment provides private citizens with standing. Compare Gillespie, 185 F.3d 693 (allowing a private plaintiff to present a Tenth Amendment challenge), with Costle, 630 F.2d at 761. The Supreme Court recently granted certiorari to address this conflict in Pierce County v. Guillen, 537 U.S. 129 (2003), but then declined to address the issue and

10

Administrator determined that Colorado was not complying with federal environmental law. The state legislators challenged the decision on various constitutional and statutory grounds, but the Colorado Attorney General filed a brief in opposition. We concluded that "[h]ence, the one party with clear standing to raise the constitutional arguments . . . not only declined to make those arguments but expressly rejected them." Id. As such, we determined that the case presented no justiciable case or controversy with regard to the constitutional arguments and dismissed the Tenth Amendment claim, stating "[o]nly the State has standing to press claims aimed at protecting its sovereign powers under the Tenth Amendment." Id.

In this case, Parker challenges the authority of the federal government to prosecute him for violating a state gun control law. He argues his prosecution violates the Tenth Amendment because it interferes with the state's Second Amendment powers. This argument is particularly unpersuasive in the present case because the federal prosecution seeks to enforce state law. Simply put, we would be hard pressed to conclude that Parker is representing Utah's interests or that the Tenth Amendment is violated when the federal government acts to enforce a Utah law which is violated on a federal enclave. In light of this court's clear statement in Costle, we conclude that Parker lacks standing to bring his Tenth Amendment claim. See also Tennessee Elec. Power Co. v. TVA, 306 U.S. 118,

---

resolved the case on other grounds. Because neither side has argued the issue of standing here and we find no Supreme Court precedent directly to the contrary, we conclude that Costle controls our disposition of the issue.

11

144 (1939) (noting where states had not objected to TVA system of supplying power, private companies, "absent the states or their officers, have no standing in this suit to raise any question under the [Tenth Amendment]").

We AFFIRM Parker's conviction, concluding the Second Amendment does not bar his prosecution under the ACA. We DISMISS with prejudice Parker's Tenth Amendment claim for lack of standing.

No. 03-4119, United States v. Dale Parker.
**KELLY**, Circuit Judge, concurring.

With the exception of the Second Amendment discussion in Part II, I join the

court's opinion. Concerning the Second Amendment, I would affirm the conviction by

simply noting that the obvious purpose of this prosecution–restricting concealed weapons

on a military base to identified military personnel–is a reasonable restriction and thus

does not contravene the Second Amendment. I write separately because I disagree with

the analysis in the court's opinion and because neither Supreme Court nor Tenth Circuit

precedent relied upon by the this court adequately addresses the question asked and

answered: "Whether a federal prosecution pursuant to the ACA [Assimilative Crimes

Act] for violating a state gun control statute violates an individual's Second Amendment

rights."

Mr. Parker was found guilty of violating Utah Code Ann. § 76-10-505,[1] as

assimilated by 18 U.S.C. § 13(a). The State provision generally prohibits carrying a

---

[1] That section provides:

**Carrying loaded firearm in vehicle, on street, or in prohibited area.**
(1) Unless otherwise authorized by law, a person may not carry a loaded
firearm:
(a) in or on a vehicle;
(b) on any public street; or
(c) in a posted prohibited area.
(2) A violation of this section is a class B misdemeanor.

Utah Code Ann. § 76-10-505.

loaded firearm in or on a vehicle.[2]  Although the Supreme Court has twice stated that the

Second Amendment does not apply to States because it is solely a limitation on national

power, Presser v. Illinois, 116 U.S. 252, 265 (1886); United States v. Cruikshank, 92 U.S.

542, 553 (1875); 2 Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional

Law–Substance and Procedure § 14.2 at 520 n.4 (3d ed. 1999); see also State v. Vlacil,

645 P.2d 677, 680 (Utah 1982) & id. at 681 n.1 (Oaks, J., concurring), the State provision

in this case is being enforced on a federal enclave by the federal government.  See Lewis

v. United States, 523 U.S. 155, 160, 162 (1998) (discussing function and application of

Assimilative Crimes Act).

In United States v. Miller, 307 U.S. 174 (1939), the Supreme Court rejected a

Second Amendment challenge to the National Firearms Act.  The case involved a

restricted firearm, specifically a double barrel twelve gauge shot gun having a barrel less

than eighteen inches in length.  In reversing the district court which found a Second

Amendment violation as a matter of law, the Court held:

> In the absence of any evidence tending to show that possession or use of a
> "shotgun having a barrel of less than eighteen inches in length" at this time
> has some reasonable relationship to the preservation or efficiency of a well
> regulated militia, we cannot say that the Second Amendment guarantees the
> right to keep and bear such an instrument. Certainly it is not within judicial

---

[2]  Mr. Parker did not declare a loaded .38 Colt double action six-shot revolver at the gate of the military installation and it was discovered in a random search.  Although the firearm was at one time in police service, Mr. Parker contended at the trial that it was neither military grade nor current peace officer grade, but rather solely for personal self-defense and target practice.  Aplt. App. at 30, 34.

2

> notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense. <u>Aymette v. State of Tennessee</u>, 2 Humph., Tenn., 154, 158.

<u>Miller</u>, 307 U.S. at 178.  In <u>Lewis v. United States</u>, 445 U.S. 55, 65 (1980), the Court held that the statute prohibiting a felon from possessing a firearm was not violative of due process, noting that the federal firearm regulatory restrictions "are neither based upon constitutionally suspect criteria, nor do they trench upon any constitutionally protected liberties." <u>Id.</u> at n.8.  The Court cited <u>Miller</u> for the proposition that "the Second Amendment guarantees no right to keep and bear a firearm that does not have 'some reasonable relationship to the preservation or efficiency of a well regulated militia.'" <u>Id.</u> (quoting <u>Miller</u>, 307 U.S. at 178).

Although not required by the cases before them, courts, including the Tenth Circuit, have concluded based upon the above that the Second Amendment is a collective, rather than an individual right.  <u>See</u> <u>United States v. Graham</u>, 305 F.3d 1094, 1106 (10th Cir. 2002).  Our first case interpreting <u>Miller</u> involved prosecution under 26 U.S.C. § 5861(d) for unlawful possession of an unregistered machine gun.  <u>United States v. Oakes</u>, 564 F.2d 384, 385 (10th Cir. 1977).  The court, despite the universal admonition to decide constitutional issues narrowly,  first rejected an "absolute right to keep arms," and then rejected an argument based upon the defendant's apparent membership in a class of persons constituting the Kansas militia.  <u>Id.</u> at 387.  Even though the defendant might have technically been a member of the Kansas militia, he had not shown any connection

3

between the restricted firearm and the militia.  Id.  United States v. Baer, 235 F.3d 561, 564 (10th Cir. 2000), involved a prosecution under 18 U.S.C. § 922(g)(1) & (k) for unlawful possession of a firearm by a felon (restricted person) and of a firearm with an obliterated serial number (restricted firearm).  The court stated that "the circuits have consistently upheld the constitutionality of federal weapons regulations . . . absent evidence that they in any way affect the maintenance of a well regulated militia."  Id. Regardless of the fact that a machine gun might be useful in a well regulated militia, it is apparent that a felon would not be.

Beginning with United States v. Haney, 264 F.3d 1161 (10th Cir. 2001), the analysis in the Tenth Circuit became more structured.  Haney involved prosecution under 18 U.S.C. § 922(*o*) for unlawful possession of a machine gun (restricted firearm).  The court held that "a federal criminal gun-control law does not violate the Second Amendment unless it impairs the state's ability to maintain a well-regulated militia." Haney, 264 F.3d at 1165.  The court then discussed why legally and factually, the defendant could not prevail.  Because the federal gun-control statute had an exemption for possession under the authority of a State, the State's ability to maintain a well-regulated militia could not be impaired as a matter of law.  Id.  The court, in what was clearly dicta, then remarked on what factual showing a defendant need make to prove a Second Amendment violation:

> As a threshold matter, he must show that (1) he is part of a state militia; (2) the militia, and his participation therein, is "well regulated" by the state; (3)

4

machine guns are used by that militia; and (4) his possession of the machine gun was reasonably connected to his militia service.

Id.; see also United States v. Crawley, 837 F.2d 291, 292 (7th Cir. 1988) (discussing dictum). The court (without any record support) speculated that a "well-regulated" militia is one actively maintained and trained by the state. Haney, 264 F.3d at 1165-66. Our subsequent cases have applied this test, though not needed in the context of restricted persons or devices, to conclude that no Second Amendment violation occurred.

United States v. Graham, 305 F.3d 1094 (10th Cir. 2002), involved a prosecution under 18 U.S.C. § 842(a)(1) proscribing knowingly engaging in the business of dealing in explosive materials without a license, which, if one had a wild imagination, could be viewed as involving a restriction on a weapon. Id. at 1097, 1106. Almost as an afterthought, the defendant attempted to cobble together an argument that explosive devices have a common use in military training exercises, and therefore such devices are part of a right to participate in those exercises and to keep and bear arms. Id. at 1106. The court correctly noted that even assuming a defense was stated, Second Amendment rights are subject to reasonable governmental restrictions. Id. The court's discussion regarding the Haney test is totally unnecessary to the holding. Likewise in United States v. Bayles, 310 F.3d 1302, 1307 (10th Cir. 2002), a prosecution under 18 U.S.C. § 922(g)(8) for possession of a firearm while subject to a domestic violence protective order, while the court noted gratuitously that evidence of the four-part Haney test was not offered, the bottom line was that the statute was a reasonable restriction that did not

5

infringe Second Amendment rights.  Regardless of the <u>Haney</u> test, defendant was a restricted person and could not posses a weapon.

All of these cases involved uniform, federal restrictions on various types of firearms or uniform, federal restrictions on the persons possessing such firearms. Whether the Second Amendment right is an individual right or a collective right has not been decided by the Supreme Court–<u>Miller</u> did not define this aspect of the Second Amendment right, and we need not reach the issue here.  <u>See</u> <u>Printz v. United States</u>, 521 U.S. 898, 938 n.1 (1997) (Thomas, J., concurring).  Justice Thomas has acknowledged the "growing body of scholarly commentary" indicating that the Second Amendment right is an individual right, although he also notes contrary authority supporting a collective rights view.  <u>Id.</u> at 938 n.2.  Two circuits have examined this question exhaustively in light of this academic debate and reached contrary conclusions.  <u>Compare</u> <u>United States v. Emerson</u>, 270 F.3d 203, 260 (5th Cir. 2001) (individual right), <u>cert. denied</u>, 536 U.S. 907 (2002), <u>with</u> <u>Silveira v. Lockyer</u>, 312 F.3d 1052, 1086 (9th Cir. 2002) (collective right), <u>cert. denied</u>, 124 S. Ct. 803 (2003).  The Fifth Circuit's approach is deserving of serious consideration.  The court reasoned that the preamble of the Second Amendment ("A well regulated Militia, being necessary to the security of a free State,") could not override the clear substantive guarantee of the Second Amendment ("the right of the people to keep and bear Arms, shall not be infringed.").  <u>Emerson</u>, 270 F.3d at 233.  Viewing the amendment against the historical background that existed at the time, it concluded that the

people at large, from whom any militia would be formed, are guaranteed the right to keep and bear arms (and be conversant with their use) so as to facilitate the objective of the preamble. Id. at 234-36. Like this court, the Fifth Circuit recognized reasonable restrictions on the Second Amendment right are constitutional. This case also can be decided on that narrow basis–there is no need to dilute prematurely what many consider to be one of the most important amendments to the United States Constitution.